**NON-CONFIDENTIAL VERSION**

**24-1100**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**HYUNDAI STEEL COMPANY,**

**Plaintiff-Appellant**

**v.**

**UNITED STATES,**

**Defendant-Appellee**

---

**Appeal from the United States Court of International Trade in Case No. 1:21-cv-00536-JCG, Judge Jennifer Choe-Groves.**

---

**BRIEF OF PLAINTIFF-APPELLANT HYUNDAI STEEL COMPANY**

---

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey
Stephen A. Morrison

**MORRIS, MANNING & MARTIN LLP**
1333 New Hampshire Avenue, NW
Suite 800
Washington, D.C. 20036
(202) 216-4116

*Attorney for Plaintiff-Appellant*
*Hyundai Steel Company*

December 29, 2023

FORM 9. Certificate of Interest

Form 9 (p. 1)<br>March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1100 |
| **Short Case Caption** | Hyundai Steel Company v. United States |
| **Filing Party/Entity** | Hyundai Steel Company |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/29/2023

Signature: /s/ Brady W. Mills

Name: Brady W. Mills

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Hyundai Steel Company | | Kia is a publicly held company that owns more than 10% of Hyundai Steel Company. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable               ☐   Additional pages attached

| | | |
|---|---|---|
| Morris, Manning & Martin, LLP | Jordan L. Fleischer | Eugene Degnan |
| Ryan R. Migeed | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☐   None/Not Applicable               ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## NOTICE OF RELATED CASE INFORMATION

**Case Number**  24-1100

**Short Case Caption**  Hyundai Steel Company v. United States

**Filing Party/Entity**  Hyundai Steel Company

---

**Instructions:** Do not duplicate information.  The notice must only be filed at the time of filing the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  *See* Fed. Cir. R. 47.5(b).  Attach additional pages as needed.  This notice must not be included in a motion, petition, related response, or brief; please only include the Certificate of Interest (Form 9) in those documents.

---

1. **Related or prior cases.** Provide the case title, case number, and originating tribunal for each case.  Fed. Cir. R. 47.5(b)(1).

Hyundai Steel Co. v. United States
U.S. Court of International Trade No. 21-00304
U.S. Court of International Trade

☐   Additional pages attached

2. **Names of all parties involved in the cases listed above.** Do not duplicate the names of parties. Do not relist the case information. Fed. Cir. R. 47.5(b)(2)(A).

Hyundai Steel Company

United States

Nucor Corporation

☐    Additional pages attached

3. **Names of all law firms, partners, and associates in the cases listed above.** Do not duplicate the names of law firms, partners, and associates. Do not relist case information and party names. Fed. Cir. R. 47.5(b)(2)(B).

Morris, Manning, and Martin LLP: Brady W. Mills, Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, Eugene Degnan, Jordan L. Fleischer, Nicholas C. Duffey

Wiley Rein LLP: Alan H. Price, Christopher B. Weld, Maureen E. Thorson, Tessa V. Capeloto, and Adam M. Teslik

U.S. Department of Justice: Bryan M. Boyton, Patricia M. McCarthy, Claudia Burke, Elizabeth Anne Speck,

U.S. Department of Commerce: Ayat Mujais

☐    Additional pages attached

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/29/2023

Signature:    /s/ Brady W. Mills

Name:    Brady W. Mills

## **TABLE OF CONTENTS**

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rule 25.1(d)(1)(B), Plaintiff-Appellant has prepared a non-confidential version of its brief from which it has redacted certain confidential information.  Confidential information has been removed from pages 4, 6, 16-17, 20, and 26 of the brief.

This confidential information relates to the length of time which Hyundai Steel was given port usage rights, the expenses which Hyundai Steel and the Government of Korea spent in constructing the port, and amounts of certain fees.

I.     **INTRODUCTION** ......................................................................... 1
II.    **STATEMENT OF RELATED CASES** ....................................... 1
III.   **JURISDICTIONAL STATEMENT** .......................................... 1
IV.    **STATEMENT OF THE ISSUES** ............................................... 2
V.     **STATEMENT OF THE CASE** .................................................. 2
VI.    **SUMMARY OF ARGUMENT** ................................................. 10
VII.   **STANDARD OF REVIEW** ...................................................... 12
VIII.  **ARGUMENT** ............................................................................ 12

   A. **Commerce's Determination that the GOK's Provision of Port Usage Rights Provides a Countervailable Benefit is Unsupported by Substantial Evidence and is Otherwise Contrary to Law** .................. 13

      1. **The Port Usage Rights are Contractual Repayment for Construction of the Port and Thus Do Not Provide a Benefit to Hyundai Steel.** ...................................................................... 13

      2. **This Court's Decision In *AK Steel* Is Inapposite** ............................. 21

IX.    **CONCLUSION AND STATEMENT OF RELIEF SOUGHT** ............... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)................................................................ 21, 22, 23

*Gov't Sri Lanka v. United States*,
    308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ........................................ 14, 19, 20

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    922 F.3d 1348 (Fed. Cir. 2021)............................................................................ 12

*Hyundai Steel Co. v. United States*,
    651 F. Supp. 3d 1351 (Ct. Int'l Trade 2023) ............................................. 8, 9, 10

*Hyundai Steel Co. v. United States*,
    651 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) .................................................... 10

*Hyundai Steel v. United States*,
    658 F. Supp. 3d 1331 (Ct. Int'l Trade Sept. 26, 2023) ................... 13, 14, 15, 17

*Saha Thai Steel Pipe (Public) Co. v. United States*,
    635 F.3d 1335 (Fed. Cir. 2011)............................................................................ 12

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................ 12

19 U.S.C. § 1677(5) ..................................................................................... 19, 22

19 U.S.C. § 1677(5)(B), (5A)............................................................................ 12

19 U.S.C. § 1677(5)(C) ...................................................................................... 17

19 U.S.C. § 1677(5)(E) .......................................................................... 13, 14, 22

28 U.S.C. § 1295(a)(5) ......................................................................................... 1

28 U.S. C. § 1581(c)............................................................................................. 1

**Regulations**

19 C.F.R. § 351.106(c) ................................................................. 7, 13

19 C.F.R. §§ 351.503–351.520 ......................................................... 15

19 C.F.R. § 351.503(b) .............................................................. 13, 22

19 C.F.R. § 351.503(b)(1) ............................................................... 14

19 C.F.R. § 351.503(c) .................................................................... 18

19 C.F.R. § 351.504 ........................................................................ 19

**Other Authorities**

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea:*
    *Final Results of Countervailing Duty Admin. Review; 2018*, 86 Fed.
    Reg. 47,621 (Dep't Commerce Aug. 26, 2021) ......................................... 2, 8, 13

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea:*
    *Preliminary Results of Countervailing Admin. Review; 2018*, 86
    Fed. Reg. 10,533 (Dep't Commerce Feb. 22, 2021) ........................................... 7

*Final Affirmative Countervailing Duty Determination: Stainless Steel*
    *Sheet and Strip in Coils from the Republic of Korea*, 64 Fed. Reg.
    30,636, 30,649 (Dep't Commerce June 8, 1999) ................................... 23, 24, 26

*Final Affirmative Countervailing Duty Determinations and Final*
    *Negative Critical Circumstances Determinations: Certain Steel*
    *Products From Korea*, 58 Fed. Reg. 37,338 (Dep't Commerce July
    9, 1993) ....................................................................... 21, 22, 23, 24

*Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 84
    Fed. Reg. 67,712 (Dep't Commerce Dec. 11, 2019) ........................................... 3

*Notice of Final Affirmative Countervailing Duty Determination:*
    *Certain Cold-Rolled Carbon Steel Flat Products from the Republic*
    *of Korea*, 67 Fed. Reg. 62,102 (Dep't Commerce Oct. 3, 2002) ....................... 24

*Notice of Final Results of Countervailing Duty Admin. Review: Certain*
    *Cut-to-Length Carbon-Quality Steel Plate from the Republic of*
    *Korea*, 72 Fed. Reg. 38,565 (Dep't Commerce July 13, 2007) .................. 24, 25

Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat. 4809
    (1994) ................................................................................................. 22

## I.    <u>INTRODUCTION</u>

Plaintiff-Appellant Hyundai Steel Company ("Hyundai Steel") hereby respectfully submits its principal brief pursuant to Federal Rule of Appellate Procedure 28(a) and Federal Circuit Rule 28(a).

## II.    <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5(a)(1), counsel for Hyundai Steel is aware of no other appeal in or from the same civil action that has previously been before this or any other appellate court.  Pursuant to Federal Circuit Rule 47.5(a)(2), counsel believe that a decision in this action will affect the following cases pending before the U.S. Court of International Trade ("CIT"):  *Hyundai Steel Co. v. United States*, CIT Case Number 21-00304.  Pursuant to Federal Circuit Rule 47.5(b), Hyundai Steel separately filed a Notice of Related Case Information regarding the related case.

## III.    <u>JURISDICTIONAL STATEMENT</u>

Hyundai Steel appeals from the final judgment of the CIT in *Hyundai Steel Co. v. United States* entered on August 21, 2023.  Appx00014.  The CIT exercised jurisdiction pursuant to 28 U.S. C. § 1581(c).  This Court has jurisdiction to review the CIT's decision pursuant to 28 U.S.C. § 1295(a)(5).  Hyundai Steel timely appealed the CIT's August 21, 2023 judgment on October 20, 2023, within 60 days of the final entry of judgment as required by Federal Rule of Appellate Procedure 4(a)(1)(B).

1

IV.    **STATEMENT OF THE ISSUES**

1.    Whether the U.S. Department of Commerce's ("Commerce")

determination that Hyundai Steel received a countervailable benefit from the

Provision of Port Usage Rights at the Port of Incheon program ("Port Rights

Program" or "port usage rights") is supported by substantial evidence and is

otherwise in accordance with law where such port usage rights were provided as

contractual reimbursement for construction of the port, ownership of which was

reverted to the Government of Korea ("GOK"), and where the value of the port

usage rights did not exceed the costs Hyundai Steel incurred in building the port.

V.    **STATEMENT OF THE CASE**

This appeal arises from Commerce's 2018 administrative review of the

countervailing duty ("CVD") order on hot-rolled steel flat products ("HR") from

the Republic of Korea ("Korea").  *Certain Hot-Rolled Steel Flat Products from the*

*Republic of Korea: Final Results of Countervailing Duty Admin. Review; 2018*, 86

Fed. Reg. 47,621 (Dep't Commerce Aug. 26, 2021), Appx15854-Appx55 ("*Final*

*Results*"), and accompanying Issues and Decision Mem., Appx15826-Appx15853

("I&D Mem."), as amended by Commerce's Final Results of Redetermination

Pursuant to Court Remand (Apr. 10, 2023), Appx00029-Appx00067 ("Remand

Results").

On December 11, 2019, Commerce initiated an administrative review of the CVD order on HR from Korea. *Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 84 Fed. Reg. 67,712 (Dep't Commerce Dec. 11, 2019), Appx00162-Appx00168.  Commerce selected Hyundai Steel as a mandatory respondent.  Mem. to Shawn Thompson, "Admin. Review of the Countervailing Duty Order on Certain Hot-Rolled Steel Flat Prods. from the Republic of Korea: Respondent Selection" (Feb. 11, 2020), Appx00187.  Commerce then issued a questionnaire to the GOK and Hyundai Steel.  Letter to Jinman Ro, "Admin. Review of the Countervailing Duty Order of Certain Hot-Rolled Steel Flat Prods. from the Republic of Korea: Initial Questionnaire," (Feb. 20, 2020), Appx00195-Appx00291.

In response to Commerce's questionnaire, Hyundai Steel reported that between March 2003 and January 2007, it paid for the construction of a port facility at North Incheon Harbor and received reimbursements for a small portion of the construction costs from the GOK between 2004 and 2007.  Letter to Sec'y Commerce, "Certain Hot-Rolled Steel Flat Prods. from the Republic of Korea, Case No. C-580-884: Hyundai Steel's Initial Questionnaire Resp.," (Apr. 9, 2020), Appx03800.  Construction of the port took place under an agreement between Hyundai Steel and the GOK's Ministry of Oceans and Fisheries.  Appx03801.  Pursuant to this agreement, Hyundai Steel agreed to finance construction of the

port, while the GOK incurred no direct expenses in relation to the construction. Appx03801. Upon completion of the port in 2007, ownership of the port facility reverted to the GOK as required pursuant to the agreement and in accordance with Article 15 of the Harbor Act. *See* Appx03801, Appx05731-Appx05732; Letter to Sec'y Commerce, "Certain Hot-Rolled Steel Flat Prods. from the Republic of Korea, 01/01/2017–12/31/2017 Admin. Review, Case No. C-580-884: The Republic of Korea's Resp. to the Countervailing Duty First Supplemental Questionnaire," (July 16, 2020), Appx10244.

In return for financing construction of the port, Hyundai Steel acquired the right to operate and use the port for its own operations, as well as collect certain fees from third party users for a period of [                    ] as reimbursement for the costs it incurred in financing and constructing the port facility. Appx03802. Hyundai Steel reported that, to date, no other parties had used the port, and that the only income Hyundai Steel received for operating the port was berthing income it received from shipping companies that transported its purchased goods. Appx03802. Hyundai also reported the total berthing income it received from 2007 through the 2018 period of review ("POR") and that, to date, it had collected no other fees besides the reported berthing fees. Appx03802; Appx05996. Hyundai Steel was <u>not</u> given free usage of the port and was not exempt from the payment of port usage fees to the GOK. Appx13293.

The agreement between Hyundai Steel and the GOK included estimates of the amount of berthing and unloading fees Hyundai Steel could collect until it was fully reimbursed for the costs of constructing the port. Appx05877–Appx05881, Appx05972–Appx05977. The agreement estimated the volume and type of cargo for which Hyundai Steel could charge unloading fees, and multiplied those by the projected future unit prices to produce the reimbursement schedule. *Id*. As discussed, Hyundai Steel has not collected certain fees that it could have collected pursuant to its port usage rights. Letter to Sec'y Commerce, "Certain Hot-Rolled Steel Flat Prods. from the Republic of Korea, Case No. C-580-884: Hyundai Steel's Second Supplemental Questionnaire Resp.," (Jan. 21, 2021), Appx13281–Appx13294, Appx13359. No third parties used the port during the 2018 POR and Hyundai Steel has thus not collected many of the fees that were factored into the formula used to calculate the length of time needed to reimburse. Appx13284. Hyundai Steel has collected less income pursuant to its port usage rights than originally projected. *See* Appx13307 (discussing how the actual fees collected are significantly lower than the estimates included in the agreement between Hyundai Steel and the GOK).

On January 8, 2021, Commerce issued supplemental questionnaires to both Hyundai Steel and the GOK regarding the Port Rights Program. Letter from Robert Galantucci to Government of the Republic of Korea, "Administrative Review of the

Countervailing Duty Order on Certain Hot-Rolled Steel Flat Prods. from the

Republic of Korea: Second Supplemental Questionnaire," (Jan. 8, 2021),

Appx12903–Appx12905; Letter from Robert Galantucci to Hyundai Steel, (Jan. 8,

2021), Appx12906–Appx12909.  In response, Hyundai Steel explained that under

the program, it collected only berthing fees and described the nature of certain other

fees that it could have collected, but did not.  Appx13281–Appx13294.[1]  Hyundai

Steel maintained that these other non-collected fees were not benefits and provided

Commerce with a worksheet demonstrating the calculation of these additional fees

(harbor exclusive usage fees).  Appx13359.

     The GOK's response to Commerce's supplemental questionnaire described in

great detail how Hyundai Steel's reimbursement schedule was calculated.

Specifically, the GOK calculated the **[**               **]** period during which

Hyundai Steel would be entitled operate the port and collect certain fees from third

parties—until Hyundai Steel recuperated its construction costs.  Letter to Acting

Sec'y Commerce, "Certain Hot-Rolled Flat Prods. from the Republic of Korea,

---

[1] Specifically Hyundai Steel explained that pursuant to the agreement, Hyundai Steel was entitled to, but had not collected, (i) unloading income from third party users of the port (as there had been none during the POR); and (ii) harbor exclusive usage fees from a terminal operating company in connection with its own use of the port. *See* Appx13281–Appx13289.  In sum, Hyundai Steel noted that it was entitled to, but did not, collect **[**       **]** KRW in harbor exclusive usage fees during the POR, or approximately **[**       **]** dollars.  Appx13288.

01/01/2018 – 12/31/2018 Admin. Review, Case No. C-580-884: The Republic of

Korea's Resp. to the Countervailing Duty Second Supplemental Questionnaire,"

(Jan. 21, 2021), Appx13031.

On February 22, 2021, Commerce preliminarily determined that the

provision of port usage rights constituted a countervailable subsidy. *See Certain*

*Hot-Rolled Steel Flat Products From the Republic of Korea: Preliminary Results of*

*Countervailing Admin. Review; 2018*, 86 Fed. Reg. 10,533 (Dep't Commerce Feb.

22, 2021) ("*Preliminary Results*"), Appx15639–Appx15641, and accompanying

Decision Mem., Appx15573–Appx15592.  Commerce calculated an *ad valorem*

subsidy rate of 0.01 percent for the Port Rights Program.  Appx15590.  In total,

Commerce preliminarily determined that Hyundai Steel received a countervailable

subsidy rate of 0.51 percent ad valorem, Appx15640,—a rate just over the *de*

*minimis* threshold under Commerce's regulations, *see* 19 C.F.R. § 351.106(c).

In its case brief at Commerce, Hyundai Steel argued that Commerce's

preliminary determination that Hyundai Steel's port usage rights were

countervailable was in error.  *See* Letter to Sec'y Commerce, "Certain Hot-Rolled

Steel Flat Prods. from the Republic of Korea, Case No. C-580-884: Hyundai Steel

Case Br.," (July 2, 2021), Appx16320–Appx16337.  Hyundai argued that

Commerce failed to properly consider Hyundai Steel's port usage rights in the

context of the costs Hyundai Steel incurred building the port at Incheon Harbor.

*See* Appx16327–Appx16336.  Specifically, Hyundai Steel argued that Commerce's

analysis of the port usage rights Hyundai received failed to address whether the

provision of these rights was "excessive" in light of the significant costs borne by

Hyundai Steel in constructing and ceding ownership of the port.  *See* Appx16323–

Appx16327.

On August 26, 2021 Commerce published its *Final Results*.  Appx16511–

Appx16512.   Commerce continued to find that Hyundai Steel's port usage rights

constituted a countervailable subsidy.  Appx16501–Appx16505.  Commerce

refused to view Hyundai Steel's port usage rights as repayment of the substantial

construction costs incurred by Hyundai Steel in constructing the port.  *See*

Appx16502–03.  Instead, Commerce treated the port usage rights as a recurring

subsidy.  *See* Appx16501.

Hyundai Steel appealed the *Final Results*.  *Hyundai Steel Co. v. United States*

("*Hyundai Steel I*"), 615 F. Supp. 3d 1351 (Ct. Int'l Trade 2023), Appx00001–13.

The CIT remanded Commerce's determination that the provision of port usage

rights conferred a benefit to the agency for further reconsideration for Commerce's

failure to consider information "regarding adequate remuneration for port usage in

relation to the prevailing market conditions such as 'price, quality, availability,

marketability, transportation, and *other conditions of purchase or sale*.'"

Appx00010 (emphasis in original).  On remand, Commerce continued to find that

8

the GOK's provision of port rights conferred a benefit to Hyundai Steel. Commerce's Final Results of Redetermination Pursuant to Court Remand (Apr. 10, 2023) ("Remand Results"), Appx00055.  The remand determination focused primarily on Commerce explanation for why its determination was based on a "revenue foregone" analysis and not a "less than adequate remuneration (LTAR)" analysis and, thus, the CIT's finding that Commerce erred when it did not provide an analysis "regarding adequate remuneration for port usage in relation to the prevailing market conditions, such as price, quality, availability, marketability, transportation, *and other conditions of purchase or sale*" was not accurate. Appx00031-Appx00032 (quoting *Hyundai Steel I*, Appx00010 (emphasis in original); *see also* Appx00040–Appx00047.

On August 21, 2023, the CIT summarily sustained the Remand Results concluding that Commerce had "reasonably determined that it should conduct a revenue foregone analysis rather than an LTAR analysis" and observing "that Commerce cited substantial evidence, including Hyundai Steel's April 10, 2020 Initial Questionnaire Response ("IQR") at 43,[2] to support its determination that the

---

[2] The citation to the IQR relied on by the CIT states that "{t}he only benefit Hyundai Steel received is for its berthing fees from shipping companies that transported Hyundai Steel' purchased goods."  Appx03802.  This was a statement made by Hyundai Steel to indicate that the berthing fees collected were the only income it received from operating the port and that these fees were small in comparison to the costs it incurred in building the port. Appx03801–Appx03804.

{GOK} conferred the right to Hyundai Steel to collect revenue from third-party users of the port. *Hyundai Steel Co. v. United States* ("*Hyundai Steel II*"), 651 F. Supp. 3d 1321, 1326 (Ct. Int'l Trade 2023), Appx00022–23.[3] Given that the CIT's original decision and Commerce's remand determination focused on the issue of whether a revenue foregone or LTAR analysis was appropriate, the majority of the arguments originally made by Hyundai Steel in *Hyundai Steel I* were not addressed by the CIT in *Hyundai Steel II*. The CIT's entire discussion of whether Commerce's determination was lawful under the revenue foregone analysis was limited to two sentences. *See* Appx00022–Appx00023.

## VI.    <u>SUMMARY OF ARGUMENT</u>

Commerce's determination that Hyundai Steel received a countervailable benefit from the GOK's provision of port usage rights to reimburse Hyundai Steel for its construction costs incurred in building the Incheon North Harbor port is unsupported by substantial evidence and is not in accordance with law.

There is no basis to treat the port usage rights as a countervailable benefit because the rights were provided by the GOK as repayment of a debt and were not a

---

This lone record citation does not constitute substantial evidence that the GOK conferred a benefit on Hyundai Steel.

[3] In *Hyundai Steel II* the CIT also affirmed Commerce's remand determination finding that Hyundai Steel did not receive a countervailable subsidy from the Sewerage Usage Fees Program. *See* Appx00023–Appx00026. This issue is not part of this appeal and thus is not discussed further herein.

gift-like transfer of funds that provided an advantage or profit to Hyundai Steel. Hyundai Steel and the GOK entered into an agreement whereby Hyundai Steel financed virtually the entire cost of constructing a port—a port which Hyundai Steel was required to cede ownership of to the GOK upon its completion.  In order to reimburse Hyundai Steel for the costs it incurred in building the port, the GOK provided Hyundai Steel with the right to collect certain fees from users of the port for a period of time calibrated to permit Hyundai Steel to recoup its costs, and nothing more.  The port rights thus did not provide an advantage or profit to Hyundai Steel but were instead provided as reimbursement for construction of a port.  This is not a "benefit" let alone a countervailable one.

Commerce's treatment of the port rights as a benefit also ignores its own practice where it has found that the provision of port usage rights in Korea may be countervailable if the resulting benefit was "excessive."  This is a reasonable practice as it focuses upon whether the reimbursement exceeds the costs incurred and thus bestows an advantage or profit on the recipient.  Commerce has applied this excessive benefit framework in various Korean cases, but failed to do so here. Had it applied this excessive benefit framework, it is plain that Hyundai Steel's port usage rights are not "excessive" and were calibrated to last only as long as necessary for Hyundai Steel to recoup the costs it incurred in building the port.

## VII.  <u>STANDARD OF REVIEW</u>

This Court reviews CIT decisions *de novo*.  *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 922 F.3d 1348, 1352 (Fed. Cir. 2021).  In doing so, this Court applies the same standard of review applied by the CIT in its review of Commerce's determinations and, thus, will uphold a Commerce determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law.  *Saha Thai Steel Pipe (Public) Co. v. United States*, 635 F.3d 1335, 1340 (Fed. Cir. 2011); 19 U.S.C. § 1516a(b)(1)(B)(i).

## VIII.  <u>ARGUMENT</u>

In order to find the existence of a countervailable subsidy Commerce must determine that a government authority has provided (i) a financial contribution, that (ii) confers a benefit, and that is (iii) specific.  19 U.S.C. § 1677(5)(B), (5A).  This case presents a challenge to Commerce's determination that the GOK's provision of port rights at Incheon Harbor conferred a "benefit" to Hyundai Steel.  Although the calculated benefit amount is small this issue is important to Hyundai Steel because the 0.01 percent margin associated with the port usage rights program is the difference between receiving a *de minimis* subsidy margin or a subsidy margin that is just above *de minimis*.  Receiving a *de minimis* margin means that Hyundai Steel receives refunds for all the CVD cash deposits it paid in calendar year 2018; a margin over *de minimis* means it does not.  *See* 19 C.F.R. § 351.106(c).

**A.      Commerce's Determination that the GOK's Provision of Port Usage Rights Provides a Countervailable Benefit is Unsupported by Substantial Evidence and is Otherwise Contrary to Law.**

**1.      The Port Usage Rights are Contractual Repayment for Construction of the Port and Thus Do Not Provide a Benefit to Hyundai Steel.**

In the *Final Results*, Commerce determined that Hyundai Steel received a benefit from the Port Rights Program under 19 C.F.R. § 351.503(b) because "Hyundai Steel was able to collect berthing fees and other fees and was not required to transmit those fees to the GOK."  Appx16503.  In the *Final Results* and on remand, Commerce refused to consider the costs Hyundai Steel incurred in constructing the port, ownership of which was reverted to the GOK.  Appx16503–Appx16504; Appx00048–Appx00051.  This was error.  Consideration of the reason *why* the GOK provided the port usage rights was necessary for Commerce to fulfill its obligation to determine if Hyundai Steel received a countervailable benefit.

As a starting point, "{t}he plain and obvious import of the statute is that a countervailable 'benefit' 'normally' requires, well, 'a benefit to the recipient.'" *See Hyundai Steel v. United States*, 658 F. Supp. 3d 1331, 1335 (Ct. Int'l Trade Sept. 26, 2023) (citing 19 U.S.C. § 1677(5)(E)).  "A benefit is an '{a}dvantage, profit, good.'" *Id.* (citing Oxford English Dictionary (online edition)).  Thus, "{i}f there's no advantage, profit, or good to the recipient from the government program at issue,

13

then there's no countervailable benefit for purposes of the statute." *Id.* The statute and regulations confirm this definition of benefit.

Under the CVD statute, "{a} benefit shall normally be treated as conferred when there is a benefit to the recipient." 19 U.S.C. § 1677(5)(E). The statute provides examples of benefits that are countervailable, including: (i) equity infusions where the government's investment decision is inconsistent with the usual investment practice of private investors; (ii) loans at preferential interest rates; (iii) loan guarantees that lower the amount the recipient pays on the loan; and (iv) the provision of goods or services for LTAR, or the purchase of goods for more than adequate remuneration. *Id.* § 1677(5)(E)(i)-(iv). In each of these statutory examples, the recipient is getting some advantage, profit or good that is to its "benefit." *Id.* § 1677(5)(E). This makes sense since "{t}he touchstone of {§ 1677(5)(E)} . . . is that what the company received somehow exceeded what {it} paid or should have paid, which is often "tested by reference to what would otherwise be available under normal market conditions." *Gov't Sri Lanka v. United States* ("*GOSL*"), 308 F. Supp. 3d 1373, 1383 (Ct. Int'l Trade 2018). Commerce's regulations are in accord. 19 C.F.R. § 351.503(b)(1) states that "the Secretary normally will consider a benefit to be conferred where a firm pays less for its

14

inputs . . . than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn."[4]

In *Hyundai Steel v. United States*, 658 F. Supp. 3d 1331, 1335 (Ct. Int'l Trade Sept. 26, 2023), the CIT applied this interpretation of "benefit" to the exact same port rights usage program that is at issue in this appeal. In that case, the court held that Commerce's treatment of this port rights program as providing a countervailable benefit was not in accordance with law. *See id*. at 1336. The court held that Commerce's position that it did not have to consider Hyundai Steel's costs in constructing the port facilities to determine whether the company received a benefit, or whether the port usage rights accurately reflected the costs of constructing the port, was erroneous as a matter of law. *Id.* In doing so, the court held that if "the value of the port-usage rights did not exceed its construction costs, then the company received no '{a}dvantage, profit, {or} good,' and thus no countervailable benefit." *Id.* This Court should reach the same conclusion.

As discussed, Korean law requires that certain infrastructure be under government control, including harbors, wharfs, and related infrastructure. Appx10244 (providing Article 15 of the Harbor Act, which states that "ownership

---

[4] Commerce's regulations provide further guidance on the identification and measurement of a benefit that include the statutory examples and others. *See* 19 C.F.R. §§ 351.503–351.520.

of land developed or harbor facilities installed . . . shall vest in the State upon completion of the harbor project"). However, given the immense costs in constructing such infrastructure, the GOK allows private entities to finance and construct this infrastructure through the Harbor Act and the Act on Private Participation in Infrastructure (also known as the Private Participation in Social Infrastructure Act) ("PPI Act"). *See* Appx03802, Appx06019–Appx06044. The PPI Act contemplates several methods for these investments. Of relevance here, is the "BTO" method (Build-Transfer-and-Operate), under which ownership of infrastructure is transferred to the GOK upon completion of construction and the private investor has the right to operate the infrastructure for a specified period of time. Appx06023.

In accordance with the PPI Act, Hyundai Steel and the GOK entered into an agreement to construct a wharf at North Incheon Harbor. Appx03801. Under the agreement, the GOK incurred no direct expenses in relation to construction of the port facility—the vast majority of the construction costs were borne by Hyundai Steel.[5] *See id*. Instead, Hyundai Steel and the GOK agreed to a reimbursement schedule under which Hyundai Steel acquired the right to operate and use the

---

[5] Over the five-year construction period, the GOK reimbursed Hyundai Steel for some construction costs in an amount totaling [                    ] Korean won, Appx03801, or approximately [              ] U.S. dollars. These payments represented only a fraction of the approximately [              ] U.S. dollars Hyundai Steel invested in construction of the port. Appx13031.

16

harbor facility and collect certain fees until its construction costs were repaid. *See* Appx05711–Appx05891 (North Incheon Harbor Agreement); Appx05893–Appx05994 (Revised North Incheon Harbor Agreement). The parties calculated, based on future fees estimated at the time of the agreement, that it would take **[**

**]** to reimburse Hyundai Steel for its construction costs. *See* Appx13035–Appx13036. In other words, the port usage rights conferred to Hyundai Steel were contractually negotiated reimbursement for Hyundai Steel's construction of the port.

This tailored reimbursement period, which was calculated to last only as long as necessary to reimburse Hyundai Steel for its construction costs, did not result in a countervailable benefit. As in *Hyundai Steel*, these port usage rights provide "no advantage, profit, or good" to Hyundai Steel as the amount it has collected to date from its port usage rights is not even close the amount of the construction costs it incurred. *See* 658 F. Supp. 3d 1336; *see also* Appx13281–Appx13294, Appx13307, Appx13359. It is only by viewing this program in isolation, and disregarding the undisputed fact that the port usage rights were being provided to reimburse Hyundai Steel for construction costs, that Commerce was able to find that this program provides a countervailable benefit.

As support for ignoring the context in which these port usage rights were provided, Commerce relied on 19 U.S.C. § 1677(5)(C), which states in relevant part

that Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists," and 19 C.F.R. § 351.503(c), which states that Commerce "is not required to consider the effect of the government action on the firm's performance, including its prices or output, or how the firm's behavior otherwise is altered." Appx00049. Commerce concluded that "the fact that Hyundai Steel may have altered its behavior or incurred a cost to construct the Incheon port is not a factor which Commerce must consider in determining the benefit conferred upon Hyundai Steel through the receipt of the right to collect port usage fees." Appx00049.

This is a red herring. Hyundai Steel has not made any argument that Commerce is required to consider the effect of the GOK's provision of port rights on Hyundai Steel in determining if a countervailable benefit exists. Moreover, consideration of whether the value of the port usage rights exceeds the construction costs incurred by Hyundai Steel and thus provides Hyundai Steel with some advantage or profit does not require any consideration of the "effects of the subsidy" on Hyundai Steel's behavior. The program at issue here is the GOK's reimbursement to Hyundai Steel for the costs Hyundai Steel incurred in building the port prior to reverting ownership to the GOK. The question is thus not the effect of the reimbursements on Hyundai Steel's production or operations but instead

whether the reimbursements exceeded the costs incurred by Hyundai Steel in building the port and thus provided a countervailable benefit.

The CIT's decision in *Government of Sri Lanka v. United States* ("*GOSL*"), 308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) is also instructive. In *GOSL*, the CIT found that repayment of a debt is distinct from payments through grants, loans, or equity infusions—each of which "yield a new increase to the recipient's capital base at the time of the infusion, whereas interest free repayment of a debt does not." 308 F. Supp. 3d at 1381. The court reasoned that in such cases where the respondent is "serving as a payment vehicle for" a government program, the respondent is "effectively providing interest-free loans to {the government} . . . to {the respondent's} detriment, rather than its benefit," within the meaning of 19 U.S.C. § 1677(5). *Id*. at 1382 (finding repayments to the respondent for the difference between the market price for rubber and the mandated "above market 'guaranteed price'" did not provide a benefit). The court concluded that the program at issue was not properly assessed as a grant under 19 C.F.R. § 351.504 because the reimbursement payments "did not constitute a gift-like transfer, but rather the interest-free repayment of a debt." *Id*. at 1383. Thus, the court held that the repayments "satisf{y} neither the statutory definition, nor the regulatory interpretation of what constitutes a benefit," reversing Commerce's determination that the repayments were countervailable. *Id*. at 1384. The court also noted that

Commerce was "not authorize{d} . . . to ignore clear, readily available, and already-verified record evidence that a transfer of funds constituted *repayment of a debt*." *Id*. at 1381 (emphasis added).

Applied here, these principles also support the conclusion that the port usage rights granted to Hyundai Steel as repayment for its construction of the port at Incheon Harbor do not provide a countervailable benefit. As mentioned above, the goal of the PPI Act is to allow for the construction of public infrastructure through private investment. Appx13063 ("The purpose of this Act is to contribute to the development of the national economy, by promoting private investment in social overhead capital facilities, and thus striving for their positive and efficient expansion and operation."). As such, under the agreement between the GOK and Hyundai Steel, the GOK incurred no direct expenses in relation to the construction of the port facility, while Hyundai Steel incurred expenses of approximately [

] U.S. dollars. *See* Appx03801; Appx13031. Pursuant to the agreement, the GOK assumed ownership of the harbor facilities constructed, *see* Appx03801, and, thus, Hyundai Steel "serv{ed} as a payment vehicle for the construction of public infrastructure," *i.e.,* the port facility. *GOSL*, 308 F. Supp. 3d at 1382. Viewed in this context, it is plain that unlike a grant, loan, or equity infusion, the provision of port usage rights to Hyundai Steel "satisfies neither the statutory definition, nor the regulatory interpretation of what constitutes a benefit." *Id.* at 1384.

### 2.    This Court's Decision In *AK Steel* Is Inapposite.

Commerce attempted to support its determination to treat the GOK's provision of port usage rights to Hyundai Steel as a countervailable benefit by claiming that its determination is consistent with prior cases where it has addressed similar programs.  In particular, Commerce stated that this Court's opinion in *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) supports its benefit analysis.  *See* Appx00053.  This reliance is misplaced.  Subsequent changes in both the law and Commerce's practice render *AK Steel* inapposite to the port usage rights program at issue in this case.

*AK Steel* involved a 1993 Commerce determination, *Steel Products from Korea*.  *AK Steel*, 192 F.3d at 1369; *see also Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products From Korea*, 58 Fed. Reg. 37,338 (Dep't Commerce July 9, 1993) ("*Steel Products from Korea*").  In that determination, a Korean steel producer, POSCO, built and paid for certain port berths, and ceded ownership of the port berths to the GOK upon completion.  *AK Steel*, 192 F.3d at 1382.  The GOK exempted POSCO from dockyard fees that other companies using the port were required to pay.  *Id*.  Commerce determined that a countervailable benefit was conferred on POSCO by the exemption from these fees.  *Id*.  This Court sustained

Commerce's determination that the exemption from dockyard fees was countervailable.  *Id.*

While *AK Steel* appears similar to the case at hand, changes in law and Commerce's practice illustrate that it is inapposite.  *AK Steel* involved a 1993 Commerce decision and thus was decided under pre-URAA law.[6]  In particular, the URAA amended the applicable CVD statute by adding subsection (E) to Section 771(5) and thereby created a statutory definition of "benefit conferred," which, prior to the URAA had not been a statutory requirement.  *Compare* 19 U.S.C. § 1677(5)(E), *with* 19 U.S.C. §1677(5) (1988); *see also* 108 Stat. at 4902-03 (amending paragraph (5) of Section 771).

Several years after the enactment of the URAA, Commerce published rules in 1998 that conformed its CVD regulations to the URAA.  *Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998).  In the 1998 publication, Commerce first established the regulatory definition of benefit that it determined is applicable to the provision of port usage rights in this case, 19 C.F.R. § 351.503(b), *see Countervailing Duties*, 63 Fed. Reg. at 65,408, which did not exist at the time of the determination made in *Steel Products from Korea*.  Thus, Commerce did not apply 19 C.F.R. § 351.503(b) or 19 U.S.C. § 1677(5)(E) in *Steel Products from*

---

[6] The Uruguay Round Agreements Act ("URAA") was enacted in 1994 and, *inter alia*, amended domestic countervailing duty laws.  Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat. 4809 (1994).

*Korea*, and the Federal Circuit's opinion in *AK Steel* did not address whether the exemption of dockyard fees met the regulatory definition of "benefit."

Subsequent Commerce determinations following enactment of the URAA further render *AK Steel* inapposite. In the first *post*-URAA determination regarding the provision of port usage rights in Korea, Commerce determined that the provision of port usage rights as reimbursement for investment costs was *not* countervailable. *Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 64 Fed. Reg. 30,636, 30,649 (Dep't Commerce June 8, 1999) ("*Stainless Sheet from Korea*"). In that case, as here, the company, POSCO, had built new port facilities at its own expense. *Id*. Ownership of those facilities was required to be transferred to the GOK upon completion. *Id*. And, to compensate POSCO for its expenses, the GOK granted POSCO free usage of the facility and the right to collect fees from other users of the facility until POSCO had recovered its investment cost. *Id*. Commerce had preliminarily determined that the port usage rights provided a countervailable benefit, but, upon learning that Korean law (the Harbor Act) prohibited companies from owning certain types of infrastructure, such as ports, Commerce recognized that these port usage rights were being provided to compensate POSCO for its

investment costs. *Id*.[7]  Commerce ultimately concluded that the port usage rights were not countervailable.[8]

Commerce's treatment of these "BTO" programs further evolved after the *Stainless Sheet from Korea* case.   In *CR from Korea*, Commerce found that respondent Dongbu, unlike POSCO *in Stainless Sheet from Korea*, was making a profit based on the "excessive" 70 year exemption from paying usage fees at the port.  CR from Korea IDM at 49–50.  That is, the government was "over-compensating or over-rebating Dongbu, which provide{d} Dongbu with a countervailable benefit." *Id*. at 50.  Commerce later revisited this "excessive" benefit standard and continued to find countervailing subsidies only when a company had been overcompensated for its costs.  *See, e.g., Notice of Final Results of Countervailing Duty Admin. Review: Certain Cut-to-Length Carbon-Quality*

---

[7] This stands in stark contrast to Commerce's determination in *Steel Products from Korea*, in which Commerce did not consider Korean law mandated that port infrastructure be owned by the GOK.  58 Fed. Reg. at 37,347–48; *see also Notice of Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 Fed. Reg. 62,102 (Dep't Commerce Oct. 3, 2002) ("*CR from Korea*") and accompanying issues and decision mem. at 51 ("CR from Korea IDM") ("As established in {*Stainless Sheet from Korea*}, it is normal for a company that builds a port berth and reverts it to the GOK, not to pay usage fees and to collect fees until the company has been fully compensated for its construction costs.").

[8] Ultimately, Commerce's determination that the program was not countervailable rested on its determination that the program was not specific. *Stainless Sheet from Korea*, 64 Fed. Reg. 30,636 at 30,649.

*Steel Plate from the Republic of Korea*, 72 Fed. Reg. 38,565 (Dep't Commerce July

13, 2007) and accompanying issues and decision mem. ("CTL from Korea IDM")

at 11 (finding that 50-year operating period meant that respondent "effectively

owned and operated" the pier).

In its Remand Results, Commerce attempts to disavow its past use of an

"excessive" benefit standard.  *See* Appx00051–Appx00054.  Commerce once again

relies on the argument that "{o}nce Commerce has determined that a benefit exists,

Commerce . . . is not required to consider the effects of the subsidy."  Appx00052–

Appx00053.  As discussed, Hyundai Steel is not arguing that Commerce must

consider the effects of this program.  Moreover, this response obfuscates what

Commerce's practice really has been.  The "excessive" benefit standard does not

mean that for Commerce to determine that a benefit exists the benefit must be

"excessive" in a vacuum.  Instead, determining whether a benefit exists in the first

place depends on whether the port rights conferred to a company are excessive in

comparison to the costs incurred by a company in constructing port facilities.  Thus,

in cases where the record establishes that a respondent is receiving profit for its

construction of the port, *see* CR from Korea IDM at 49–50, or has been granted port

use rights over an excessive period of time in relation to the construction costs

incurred, *see* CTL from Korea IDM at 11; CORE from Korea PDM at 11,

Commerce has determined a benefit existed.  Conversely, where the port usage

rights lasted only until a company's investment costs had been recovered,

Commerce has determined that no benefit exists. *See Stainless Steel Sheet from*

*Korea*, 64 Fed. Reg. at 30,649. This understanding is consistent with the discussion

above in Section VIII.A.1 which demonstrated that in order for a benefit to have

been conferred, there must be some "advantage, profit, or good" associated with the

usage of a government program.

Despite the existence and application of this "excessive" benefit standard in

the cases discussed, Commerce failed to analyze Hyundai Steel's port usage rights

under this standard. In an aside in the Remand Results, Commerce states that the

[                                    ] length of port usage rights given to Hyundai Steel

exceeded the average useful life ("AUL") of a port. *See* Appx00054–Appx00055.

This explanation, however, dodges the essential question that Commerce must

answer: Did Hyundai Steel profit from this program? The record plainly establishes

that the answer to this question is "no." Hyundai Steel incurred significant costs in

constructing the port at Incheon Harbor, only a fraction of which were reimbursed

by the GOK. *See* Appx03801; Appx13031. As payment for the difference between

the total costs and the amount that had been reimbursed during construction, the

GOK carefully calibrated the length of time needed to reimburse Hyundai Steel for

its construction costs and nothing more through usage of the port and the ability to

collect certain fees from third parties. Appx13034–Appx13036.

Furthermore, the record establishes that Hyundai Steel has not collected certain fees that it could have collected pursuant to its port usage rights, Appx13281–Appx13294; Appx13359 (calculation of fees not collected), further establishing that Hyundai has not profited through this program. The record shows that no third parties used the port during the 2018 POR and Hyundai Steel has thus not collected many of the fees that were factored into the formula used to calculate the length of time needed to reimburse Hyundai Steel, Appx13284, and that Hyundai Steel has collected less income pursuant to its port usage rights than originally projected, c*ompare* Appx05996 *with* Appx05976 (demonstrating that Hyundai Steel has collected far less income pursuant to the port usage rights than estimated in the agreement). Thus, no "advantage, profit, or good" has been conferred upon Hyundai Steel through the Port Rights Program.

Accordingly, this Court should find that Commerce's determination that Hyundai Steel's port usage rights confer a countervailable benefit is not supported by substantial evidence and is otherwise not in accordance with law.

## IX.    <u>CONCLUSION AND STATEMENT OF RELIEF SOUGHT</u>

Based on the foregoing, Plaintiff-Appellant Hyundai Steel Company

respectfully requests that the Court reverse the CIT's decision sustaining

Commerce's Final Results of Redetermination with instructions for the lower court

to remand the case to Commerce to correct the errors identified by the Court.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Nicholas C. Duffey
Stephen A. Morrison

**MORRIS, MANNING & MARTIN LLP**
1333 New Hampshire Avenue, NW
Suite 800
Washington, D.C. 20036
(202) 216-4116

*Attorney for Plaintiff-Appellant*
*Hyundai Steel Company*

## <u>ADDENDUM OF REQUIRED DOCUMENTS<br>AND RELEVANT AUTHORITIES</u>

## CONTENTS

| Tab | Document | Page Range |
|:---:|:---|:---:|
| 1 | Slip Op. 23-15, *Hyundai Steel Co. v. United States*, Ct. No. 21-00536 (Ct. Int'l Trade Feb. 10, 2023) | Appx00001–Appx00013 |
| 2 | Slip Op. 23-121, *Hyundai Steel Co. v. United States*, Ct. No. 21-00536 (Ct. Int'l Trade Aug. 21, 2023) | Appx00014–Appx00027 |
| 3 | Judgment, *Hyundai Steel Co. v. United States*, Ct. No. 21-00536 (Ct. Int'l Trade Aug. 21, 2023) | Appx00028 |
| 4 | Final Results of Redetermination Pursuant to Court Remand, Hyundai Steel Company v. United States, Court No. 21-00536, Slip Op. 21-15 (CIT Feb. 10, 2023), Certain Hot-Rolled Steel Flat Products from the Republic of Korea | Appx00029–Appx00067 |

Slip Op. 23-15

# UNITED STATES COURT OF INTERNATIONAL TRADE

HYUNDAI STEEL COMPANY,

      Plaintiff,

v.

UNITED STATES,

      Defendant,

and

NUCOR CORPORATION, SSAB ENTERPRISES, LLC, and STEEL DYNAMICS, INC.,

      Defendant-Intervenors.

Before:  Jennifer Choe-Groves, Judge

Court No. 21-00536

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final results in the 2018 administrative review of the countervailing duty order on certain hot-rolled steel flat products from the Republic of Korea.]

Dated:  February 10, 2023

Brady W. Mills, Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, Eugene Degnan, Edward J. Thomas, III, Jordan L. Fleischer, and Nicholas C. Duffey, Morris, Manning & Martin, LLP, of Washington, D.C., for Plaintiff Hyundai Steel Company.

Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant

Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director.  Of counsel on the brief was <u>Hendricks Valenzuela</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

<u>Alan H. Price</u>, <u>Christopher B. Weld</u>, and <u>Theodore P. Brackemyre</u>, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor Nucor Corporation.

<u>Roger B. Schagrin</u> and <u>Jeffrey D. Gerrish</u>, Schagrin Associates, of Washington, D.C., for Defendant-Intervenors SSAB Enterprises, LLC and Steel Dynamics, Inc.

Choe-Groves, Judge:  Plaintiff Hyundai Steel Company ("Plaintiff" or "Hyundai Steel") filed this action challenging the final results in the 2018 administrative review of the countervailing duty order on certain hot-rolled steel flat products from the Republic of Korea ("Korea").  <u>Certain Hot-Rolled Steel Flat Products from the Republic of Korea</u> ("<u>Final Results</u>"), 86 Fed. Reg. 47,621 (Dep't of Commerce Aug. 26, 2021) (final results of countervailing duty admin. review; 2018); <u>see also</u> Issues and Decision Mem. for the Final Results of the 2018 Admin. Review of the Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products from the Republic of Korea ("Final IDM"), ECF No. 21-5.

Before the Court is Plaintiff Hyundai Steel Company's Motion for Judgment on the Agency Record, ECF Nos. 33, 34.  <u>See also</u> Pl. Hyundai Steel Company's Br. Supp. Its Mot. J. Agency R. ("Hyundai Steel's Br."), ECF Nos. 33-2, 34-2. Hyundai Steel challenges the determinations by the U.S. Department of Commerce ("Commerce") that the Government of Korea's provision of port usage rights to

Hyundai Steel constituted a countervailable benefit and that Hyundai Steel's

payment of reduced sewerage usage fees involved a financial contribution and a

countervailable benefit.  Hyundai Steel's Br. at 2.  Defendant United States

("Defendant") responds to Hyundai Steel's challenge regarding the provision of

port usage rights, but requests a remand of the issues involving reduced sewerage

usage fees.  Def.'s Resp. Pl.'s Mot. J. Agency R. ("Def.'s Resp."), ECF No. 35.

Defendant-Intervenors Nucor Corporation, SSAB Enterprises, LLC, and Steel

Dynamics, Inc. oppose the motion.  Resp. Mot. J. Agency R. ("Def.-Intervs.'

Resp."), ECF Nos. 38, 39.

     For the following reasons, the Court remands the <u>Final Results</u>.

## BACKGROUND

     Commerce initiated this second administrative review of the countervailing

duty order on certain hot-rolled steel flat products from Korea for the period

covering January 1, 2018 through December 31, 2018.  <u>Initiation of Antidumping</u>

<u>and Countervailing Duty Admin. Reviews</u>, 84 Fed. Reg. 67,712, 67,717 (Dep't of

Commerce Dec. 11, 2019).  Commerce selected Hyundai Steel as the sole

mandatory respondent for individual examination.  <u>See</u> <u>Final Results</u>, 86 Fed. Reg.

at 47,622.

     Commerce determined in the <u>Final Results</u> that Hyundai Steel received a

countervailable subsidy through the Port Usage Rights Program.  <u>Final IDM</u> at 17,

19.  Hyundai Steel paid for construction of a port facility at North Incheon Harbor. Id. at 19; Hyundai Steel's Br. at 3.  Although ownership of the port facility was transferred to the Government of Korea pursuant to Korean law, Final IDM at 20; Hyundai Steel's Br. at 3, the Government of Korea did not collect fees that it would have been entitled to collect normally as the port facility owner, including port usage fees from Hyundai Steel, and Hyundai Steel received the right to use the port and collect fees instead of the Government of Korea, see Final IDM at 19–21; Hyundai Steel's Br. at 3.  Hyundai Steel collected berthing income and other fees. Final IDM at 21; Hyundai Steel's Br. at 3.  Commerce determined based on Hyundai Steel's collection of these fees that Hyundai Steel had received a countervailable benefit.  Final IDM at 21.

Commerce determined also in the Final Results that Hyundai Steel received a countervailable subsidy through the Sewerage Usage Fees Program.  Id. at 23, 25.  Under an ordinance of Incheon Metropolitan City in Korea, users may receive a reduced water bill if the amount of sewage water discharged into the public sewerage system is less than the amount of clean water consumed from the public water supply system.  Id. at 25; Hyundai Steel's Br. at 3–4.  Hyundai Steel had reported to Commerce that it received reductions on its monthly water bills for low wastewater levels requiring sewage treatment.  Final IDM at 25–27; Hyundai Steel's Br. at 3–4.  Commerce determined that the reduction in Hyundai Steel's

water bill did not meet the criteria in the ordinance for a reduction and exceeded

the rate adjustments provided by the ordinance.  Final IDM at 26–27.  Commerce

determined that the reduction in Hyundai Steel's sewerage usage fees constituted a

financial contribution and countervailable benefit.  Id. at 23, 27.

Commerce calculated a final subsidy rate of 0.51% for Hyundai Steel.  Final

Results, 86 Fed. Reg. at 47,622.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and

28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting

the final results of an administrative review of a countervailing duty order.  The

Court will hold unlawful any determination found to be unsupported by substantial

evidence on the record or otherwise not in accordance with the law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

A countervailable subsidy is a financial contribution provided by an

authority (a foreign government or public entity) to a specific industry when a

recipient within the industry receives a benefit as a result of that contribution.  See

19 U.S.C. § 1677(5); see also Fine Furniture (Shanghai) Ltd. v. United States, 748

F.3d 1365, 1369 (Fed. Cir. 2014).  Section 1677(5) defines a financial contribution,

in relevant part, to mean "foregoing or not collecting revenue that is otherwise due,

such as granting tax credits or deductions from taxable income," "providing goods

or services, other than general infrastructure," and "purchasing goods." 19 U.S.C.

§ 1677(5)(D).

The statute provides that "[a] benefit shall normally be treated as conferred

. . . if [] goods or services are provided for less than adequate remuneration." <u>Id.</u>

§ 1677(5)(E), (E)(iv); <u>see</u> <u>POSCO v. United States</u>, 977 F.3d 1369, 1371 (Fed. Cir.

2020). "For purposes of clause (iv), adequacy of remuneration [is] determined in

relation to prevailing market conditions for the good or service being provided . . .

in the country which is subject to the investigation or review. Prevailing market

conditions include price, quality, availability, marketability, transportation, and

other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E).

## I.    Commerce's Determination that the Provision of Port Usage Rights Without Fee Constituted a Benefit

Commerce determined that the free provision of port usage rights associated

with the Port of Incheon Program conferred a countervailable subsidy to Hyundai

Steel. Final IDM at 19–23. Hyundai Steel challenges only Commerce's benefit

determination and does not challenge Commerce's determinations as to financial

contribution and specificity. Hyundai Steel's Br. at 6–12.

Hyundai Steel argues that Commerce should have applied its "excessive

benefit" standard, by which Commerce determines that a benefit is conferred only

if the period of port usage rights provided by the Government of Korea is

excessive, and if Commerce had applied the "excessive benefit" standard in the

Final Results, Commerce would have determined that a benefit was not conferred.

Id. at 11–19.  Hyundai Steel argues alternatively that Commerce's benefit

determination is not supported by substantial evidence and is not in accordance

with the law because the port usage rights were provided as repayment of a debt as

compensation for the taking of property when ownership was conferred to the

Government of Korea under Korean law.  Id. at 19–26.

     In determining that Hyundai Steel's non-payment of port usage fees

accorded a countervailable benefit, Commerce considered that the Government of

Korea did not collect port usage fees from Hyundai Steel that it was entitled to

collect as the owner of the port and that Hyundai Steel had the right to use the port

without charge.  Final IDM at 20 & n.97 (citing Government of Korea's Letters,

"Certain Hot-Rolled Steel Flat Products from the Republic of Korea, 01/01/2018–

12/31/2018 Administrative Review, Case No. C-580-884: The Republic of Korea's

Response to the Countervailing Duty Second Suppl. Questionnaire," dated Jan. 21,

2023 ("GOK Jan. 21, 2021 SQR") at 7–8, 16–17).  Commerce analogized the Port

of Incheon Program in this case to a program in which a government funds the

building of a port for a company's benefit because both programs involved

government assistance to build a port for the company's use.  Id. at 20.

Commerce referenced and Defendant relies on AK Steel Corp. v. United

States, 192 F.3d 1367 (Fed. Cir. 1999).  Final IDM at 20; Def.'s Resp. at 7–8.  In

AK Steel Corp., the U.S. Court of Appeals for the Federal Circuit upheld

Commerce's benefit determination based on POSCO's exemption from dockyard

fees.  192 F.3d at 1382.  Under the program at issue in that case, POSCO built and

paid for fifteen port berths when construction by the Government of Korea stalled

due to budget constraints.  Id.  POSCO ceded ownership of the port berths to the

Government of Korea pursuant to Korean law when construction was completed.

Id.  As reimbursement for the cost of construction, the Government of Korea did

not collect dockyard fees from POSCO and POSCO was the only company located

in the port facility that did not pay dockyard fees for the use of the berths.  Id.  The

U.S. Court of Appeals for the Federal Circuit sustained Commerce's rejection of

the argument that the fee exemption was reimbursement for the cost of building

and paying for the port berths that the Government of Korea would normally have

assumed because "if the Korean Government had built the port berths, instead of

having them ceded by POSCO, Commerce would have 'countervailed the

construction funding as a specific infrastructure benefit.'"  Id.  The U.S. Court of

Appeals for the Federal Circuit concluded that Commerce's determination was

supported by substantial evidence.  Id.

Although the salient facts recounted in AK Steel Corp. may be similar to the

facts in this case, the standard of review is whether Commerce's benefit

determination is supported by substantial evidence, and the instant case differs

from AK Steel Corp. in the evidence on the administrative record.

      The statute provides that when Commerce reviews whether a benefit is

conferred, "adequacy of remuneration is determined in relation to prevailing

market conditions." 19 U.S.C. § 1677(5)(E), (E)(iv). Commerce did not consider

Hyundai Steel's non-payment of port usage fees in terms of adequacy of

remuneration, which is to be "determined in relation to prevailing market

conditions," "includ[ing] price, quality, availability, marketability, transportation,

and other conditions of purchase or sale." Id. § 1677(5)(E). Commerce considered

that Hyundai Steel uses the port to transport raw materials for steel production.

Final IDM at 19 & n.93 (citing GOK Jan. 21, 2021 SQR at 14–17). Commerce

considered also that the Government of Korea is not collecting fees that it is

entitled to collect. Id. at 20 & n.97 (citing GOK Jan. 21, 2021 SQR at 7–8, 16–17).

Commerce considered that nothing on the record demonstrated that the main

purpose of building the port was for the public good or any governmental

functions. Id. at 20 & n.98 (citing Hyundai Steel's Letter, "Certain Hot-Rolled

Steel Flat Products from the Republic of Korea, Case No. C-580-884: Hyundai

Steel's Initial Questionnaire Resp.," dated Apr. 9, 2020 ("Hyundai Steel Apr. 9,

2020 IQR") at Ex. G-1. Commerce considered that the Government of Korea

agreed to provide various forms of support for the port's construction.  Id. at 20 &
n.99 (citing Hyundai Steel Apr. 9, 2020 IQR at Ex. G-1, Arts. 48–54).  Commerce
did not consider information, however, regarding adequate remuneration for port
usage in relation to the prevailing market conditions, such as "price, quality,
availability, marketability, transportation, and *other conditions of purchase or
sale*," 19 U.S.C. § 1677(5)(E) (emphasis added), and an analysis of the record
evidence to determine that the Government of Korea provided usage of the port for
less than adequate remuneration.  Without these statutorily defined components,
Commerce's determination that the provision of port usage rights constituted a
benefit is not supported by substantial evidence.

The Court remands Commerce's determination that the provision of port
usage rights associated with the Port of Incheon Program conferred a benefit for
further consideration.

## II.  Partial Remand of Commerce's Determination that Hyundai Steel's Reduced Fees Pursuant to the Sewerage Usage Fees Program Constituted a Countervailable Subsidy

Commerce determined that the difference between the amount in sewerage
usage fees that Hyundai Steel paid and the amount that Hyundai Steel would have
paid without the Sewerage Usage Fees Program constituted a countervailable
subsidy.  Final IDM at 23, 25.  Defendant requests a remand for Commerce to
reconsider its determination in light of its better understanding of the program and

Case 1:21-cv-00536-JCG   Document 45   Page 50 of 109   Filed 12/29/2023
Case 1:24-00096-JCG   Document 45   Page 502 of 109   Filed 12/29/2023

Court No. 21-00536                                                    Page 11

the underlying Korean law that governs the reduction of sewerage usage fees.

Def.'s Resp. at 13–15.  Hyundai Steel supports Defendant's request for remand,

but in the event that the Court does not grant the request, Hyundai Steel challenges

Commerce's determinations that the Sewerage Usage Fees Program constituted a

financial contribution and conferred a benefit to Hyundai Steel.  Hyundai Steel's

Br. at 26–27, 35–39.  Defendant-Intervenors did not comment on the Sewerage

Usage Fees Program issue or the remand request.  See Def.-Intervs.' Resp.

The U.S. Court of Appeals for the Federal Circuit has recognized that the

decision to remand is in the court's discretion when an agency seeks a remand

without confessing error in order to reconsider its previous position.  SKF USA,

Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (citations omitted).  If

the Court grants a remand, Commerce will reconsider its determinations regarding

the Sewerage Usage Fees Program.  Def.'s Resp. at 14–15.  It is "prefer[able] to

allow agencies to cure their own mistakes rather than wasting the court's and the

parties' resources," especially when the agency seeks to "cure the very legal

defects" challenged by other parties.  See id. at 15 (quoting Citizens Against the

Pellissippi Parkway v. Mineta, 375 F.3d 412, 416 (6th Cir. 2004)).  Because a

remand will allow Commerce to cure its own mistakes and reconsider two

substantive issues raised by Plaintiff, as well as preserve court resources, the Court

remands Commerce's benefit determination and financial contribution

determination related to the Sewerage Usage Fees Program.

## CONCLUSION

For the aforementioned reasons, the Court remands Commerce's determination that the free provision of port usage rights associated with the Port of Incheon Program conferred a benefit and Commerce's benefit and financial contribution determinations related to the Sewerage Usage Fees Program for further consideration consistent with this Opinion.

Accordingly, it is hereby

**ORDERED** that the Final Results are remanded; and it is further

**ORDERED** that this case will proceed according to the following schedule:

(1)  Commerce shall file the remand results on or before April 10, 2023;

(2)  Commerce shall file the administrative record index on or before April 24, 2023;

(3)  Comments in opposition to the remand results shall be filed on or before May 8, 2023;

(4)  Comments in support of the remand results shall be filed on or before May 22, 2023; and

(5)   The joint appendix shall be filed on or before June 5, 2023.


                                                            ___/s/ Jennifer Choe-Groves
                                                            Jennifer Choe-Groves, Judge

Dated:   February 10, 2023
            New York, New York

Slip Op. 23-121

# UNITED STATES COURT OF INTERNATIONAL TRADE

HYUNDAI STEEL COMPANY,

     Plaintiff,

v.

UNITED STATES,

     Defendant,

and

NUCOR CORPORATION, SSAB
ENTERPRISES, LLC, and STEEL
DYNAMICS, INC.,

     Defendant-Intervenors.

Before: Jennifer Choe-Groves, Judge

Court No. 21-00536

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's remand results in the 2018
administrative review of the countervailing duty order on certain hot-rolled steel
flat products from the Republic of Korea.]

Dated: August 21, 2023

Brady W. Mills, Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Mary S.
Hodgins, Eugene Degnan, Edward J. Thomas, III, Jordan L. Fleischer, and
Nicholas C. Duffey, Morris, Manning & Martin, LLP, of Washington, D.C., for
Plaintiff Hyundai Steel Company.

Tara K. Hogan, Assistant Director, and Sosun Bae, Senior Trial Counsel,
Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C., for Defendant United States. With them on the brief were

Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director. Of counsel on the brief was Hendricks Valenzuela, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Alan H. Price, Christopher B. Weld, and Theodore P. Brackemyre, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor Nucor Corporation.

Roger B. Schagrin and Jeffrey D. Gerrish, Schagrin Associates, of Washington, D.C., for Defendant-Intervenors SSAB Enterprises, LLC and Steel Dynamics, Inc.

Choe-Groves, Judge: Plaintiff Hyundai Steel Company ("Plaintiff" or "Hyundai Steel") filed this action challenging the final results in the 2018 administrative review of the countervailing duty order on certain hot-rolled steel flat products from the Republic of Korea ("Korea"). Certain Hot-Rolled Steel Flat Products from the Republic of Korea ("Final Results"), 86 Fed. Reg. 47,621 (Dep't of Commerce Aug. 26, 2021) (final results of countervailing duty admin. review; 2018); see also Issues and Decision Mem. for the Final Results of the 2018 Admin. Review of the Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products from the Republic of Korea ("Final IDM"), ECF No. 21-5.

Before the Court are the Final Results of Redetermination Pursuant to Court Remand of the U.S. Department of Commerce ("Commerce") on Certain Hot-Rolled Steel Flat Products from the Republic of Korea, filed pursuant to the Court's remand order in Hyundai Steel Co. v. United States, 47 CIT __, 615 F. Supp. 3d 1351 (2023) ("Hyundai Steel" or "Remand Order"). See Final Results of

Redetermination Pursuant to Court Remand, ECF No. 48-1 ("Remand Results"). This opinion presumes familiarity with the facts as outlined in Hyundai Steel, in which the Court remanded Commerce's determination that the free provision of port usage rights associated with the Port of Incheon Program conferred a benefit and Commerce's benefit and financial contribution determinations related to the Sewerage Usage Fees Program. Hyundai Steel, 47 CIT at __, 615 F. Supp. 3d at 1353.

On remand, Commerce reexamined the Reduction for Sewerage Fees program, determined that the program was not countervailable, and provided further explanation for its determination that the provision of port usage rights at the Port of Incheon conferred a benefit. Remand Results at 39. Commerce changed the final subsidy rate calculation from the previous rate of 0.51% for Hyundai Steel to a new subsidy rate of 0.50%. Id.

Plaintiff Hyundai Steel Company filed comments supporting Commerce's determination of the Reduction for Sewerage Fees program and opposing Commerce's port usage rights determination. Pl. Hyundai Steel Co.'s Cmts. Commerce's Redetermination Pursuant Court Remand, ECF Nos. 50, 51 ("Pl.'s Br."). Defendant United States ("Defendant") filed comments in support of Commerce's Remand Results. Def.'s Cmts. Supp. Remand Redetermination, ECF No. 56 ("Def.'s Br."). Defendant-Intervenors Nucor Corporation, SSAB

Enterprises, LLC, and Steel Dynamics, Inc. filed comments in support of

Commerce's <u>Remand Results</u>.  Def.-Intervs.' Cmts. Supp. Final Results

Redetermination Pursuant Court Remand ("Def.-Intervs.' Br."), ECF No. 55.

      For the following reasons, the Court sustains the <u>Remand Results</u>.

## JURISDICTION AND STANDARD OF REVIEW

      The Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and

28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting

the final results of an administrative review of a countervailing duty order.  The

Court will hold unlawful any determination found to be unsupported by substantial

evidence on the record or otherwise not in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).  The Court also reviews determinations made on remand for

compliance with the Court's Remand Order.  <u>Ad Hoc Shrimp Trade Action Comm.</u>

<u>v. United States</u>, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), <u>aff'd</u>, 802

F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

      A countervailable subsidy is a financial contribution provided by an

authority (a foreign government or public entity) to a specific industry when a

recipient within the industry receives a benefit as a result of that contribution.  <u>See</u>

19 U.S.C. § 1677(5); <u>see also</u> <u>Fine Furniture (Shanghai) Ltd. v. United States</u>, 748

F.3d 1365, 1369 (Fed. Cir. 2014).  Section 1677(5) defines a financial contribution,

in relevant part, to mean "foregoing or not collecting revenue that is otherwise due,

such as granting tax credits or deductions from taxable income," "providing goods

or services, other than general infrastructure," and "purchasing goods."  19 U.S.C.

§ 1677(5)(D).

The statute provides that "[a] benefit shall normally be treated as

conferred . . . if [] goods or services are provided for less than adequate

remuneration."  Id. § 1677(5)(E), (E)(iv); see POSCO v. United States, 977 F.3d

1369, 1371 (Fed. Cir. 2020).  "For purposes of clause (iv), the adequacy of

remuneration [is] determined in relation to prevailing market conditions for the

good or service being provided . . . in the country which is subject to the

investigation or review.  Prevailing market conditions include price, quality,

availability, marketability, transportation, and other conditions of purchase or

sale."  19 U.S.C. § 1677(5)(E).

## I.    Commerce's Determination that the Provision of Port Usage Rights Without Fee Constituted a Benefit

In the Final Results, Commerce determined that the free provision of port

usage rights associated with the Port of Incheon Program conferred a

countervailable subsidy to Hyundai Steel.  Final IDM at 19–23.  The Court

remanded this issue for Commerce to reconsider Commerce's benefit

determination relating to the provision of port usage rights at the Port of Incheon.

Hyundai Steel, 47 CIT at __, 615 F. Supp. 3d at 1356.

On remand, Commerce provided additional reasoning for its determination

that the provision of port usage rights at the Port of Incheon constituted a

countervailable benefit. Commerce explained at the outset that it does not view the

provision of port usage rights at the Port of Incheon as a subsidy to be analyzed for

less than adequate remuneration ("LTAR"). Remand Results at 12. Commerce

specified that it examined the agreement between Hyundai Steel and the

Government of Korea as focusing on the narrow issue of the Government of

Korea's assignment to Hyundai Steel of the right to collect certain port fees, id. at

12–13, and that Commerce regarded the financial contribution received by

Hyundai Steel to be revenue foregone. Id. at 13. Commerce noted on remand that

Hyundai Steel obtained the right to collect berthing income and other fees

associated with port activity during the period of review pursuant to the agreement

with the Government of Korea, and determined that "[t]he ability to collect such

fees (i.e., fees otherwise payable to the government) cannot be construed as the

provision of a good or service but is instead revenue forgone." Id. at 17.

Hyundai Steel argues that Commerce's determination that the prevailing

market conditions clause of section 771(5)(E) only applies to LTAR financial

contributions is not supported by the plain language of the statute. Pl.'s Br. at 6.

Hyundai Steel contends that Commerce should have analyzed the Port Rights

Program to determine if Hyundai Steel paid less for the port rights than it

otherwise would earn by considering the prevailing market conditions, including

other conditions of purchase or sale. Id. at 7. Defendant and Defendant-Intervenor

assert that Commerce's determination is in accordance with law because

Commerce determined the provision of port usage rights to be revenue foregone,

not LTAR, and conducted a proper revenue foregone analysis without examining

the prevailing market conditions. Def.'s Br. at 5–9; Def.-Intervs.' Br. at 3–8. Both

Defendant and Defendant-Intervenor contend that the LTAR standards do not

apply to the revenue foregone situation. Def.'s Br. at 5–6; Def.-Intervs.' Br. at 5.

The statute provides that when Commerce reviews whether a benefit is

conferred, "adequacy of remuneration [is] determined in relation to prevailing

market conditions." 19 U.S.C. § 1677(5)(E), (E)(iv). 19 U.S.C. § 1677(5)(E)

states that:

> For purposes of clause (iv), the adequacy of remuneration shall be
> determined in relation to prevailing market conditions for the good or
> service being provided or the goods being purchased in the country
> which is subject to the investigation or review. Prevailing market
> conditions include price, quality, availability, marketability,
> transportation, and other conditions of purchase or sale.

19 U.S.C. § 1677(5)(E).

19 U.S.C. § 1677(5)(D) states that:

Financial contribution.  The term "financial contribution" means

(i)     the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

(ii)    foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income. . . .

19 U.S.C. § 1677(5)(D).

On remand, Commerce noted that Hyundai Steel and the Government of Korea's Ministry of Oceans and Fisheries entered into agreements regarding the construction of the Port of Incheon.  Remand Results at 12.  As part of the agreements, the Government of Korea granted to Hyundai Steel the right to collect fees from third-party users of the Port of Incheon.  Id. at 12–13 (citing Hyundai Steel's Initial Questionnaire Resp. (Apr. 10, 2020) at 43, PR 61[1]).  Commerce noted that no third party has used the harbor.  Id. at 13 (citing Hyundai Steel's Initial Questionnaire Resp. at 43).  Commerce clarified on remand that its countervailing duty analysis focused on the narrow aspect of the Port Usage Rights program involving the Government of Korea's assignment to Hyundai Steel the right to collect certain port fees.  Id.  Commerce explained that it "considered the

---

[1]  Citations to the administrative record reflect the public record ("PR") and public remand record ("PRR") document numbers filed in this case, ECF Nos. 44, 58, 61, 64.

financial contribution that Hyundai Steel received pursuant to this program to be
revenue foregone. . . .  [in that] the fees that the [Government of Korea] gave
Hyundai Steel the right to collect—the berthing income and the harbor facility
usage fees—which would otherwise have been collected by the [Government of
Korea] absent the agreement between the parties, represent revenue foregone by
the [Government of Korea] within the meaning of section 771(5)(D)(ii) of the
Act." Id. (internal quotation omitted).  Commerce explained on remand that it
conducted its analysis pursuant to section 771(5)(D)(ii) because the subsidy
program was revenue foregone, not the provision of goods or services applicable
under section 771(5)(E).  Id. at 14–15.

     The Court concludes that Commerce reasonably determined that it should
conduct a revenue foregone analysis rather than an LTAR analysis because
Hyundai Steel's non-payment of port usage fees did not involve the provision of
goods or services, but rather involved a type of financial contribution from revenue
foregone when the Government of Korea conferred the right to Hyundai Steel to
collect revenue from third parties at the port.  The Court also concludes that
Commerce reasonably determined that the Government of Korea's provision of
rights under the Port of Incheon Program, specifically the right to collect revenues
from third parties using the port, conferred a benefit to Hyundai Steel.  The Court
observes that Commerce cited substantial evidence, including Hyundai Steel's

April 10, 2020 Initial Questionnaire Response at 43, to support its determination

that the Government of Korea conferred the right to Hyundai Steel to collect

revenue from third-party users of the port.  See Remand Results at 13 (citing

Hyundai Steel's Initial Questionnaire Resp. at 43).  Because Commerce's Remand

Results with respect to the Port of Incheon Program are in accordance with law and

supported by substantial evidence, the Court sustains Commerce's Remand Results

on this issue.

## II.   Partial Remand of Commerce's Determination that Hyundai Steel's Reduced Fees Pursuant to the Sewerage Usage Fees Program Constituted a Countervailable Subsidy

In the Final Results, Commerce determined that the Sewerage Usage Fees

Program was countervailable.  Final IDM at 25–27.  The Court granted

Commerce's request for remand to reconsider the Sewerage Usage Fees Program.

Hyundai Steel, 47 CIT at __, 615 F. Supp. 3d at 1356.  On remand, Commerce

explained that it gained an increased understanding of how companies could

receive a reduction in sewerage fees pursuant to the Sewerage Usage Fees Program

and changed its determination to conclude that the program did not constitute a

countervailable subsidy.  Remand Results at 5.  Commerce reviewed relevant

provisions of Korean law that govern the reduction of sewerage usage fees,

including Article 65(1) of Korea's Sewerage Act, Article 36(2) of Korea's

Enforcement Decree of the Sewerage Act, and Articles 12, 14, and 21 of the

Incheon Metropolitan City Ordinance on Sewerage System Use.  Id. at 5–10.

Commerce determined on remand that these Korean federal and municipal laws

and regulations "state that sewerage fees shall be based on the volume of sewage

discharged into the public sewerage system."  Id. at 7.  Commerce determined

based on these Korean laws and regulations that a sewerage fee reduction based on

the volume of water discharged by a participating company would not be excluded.

Id. at 8.

    In examining the amount of the sewerage fee reduction that Hyundai Steel

received on its overall water bill, Commerce determined that the rate adjustments

specified in Appendix 4 of the Incheon Metropolis City Ordinance on Sewerage

System Use ("Ordinance") apply to narrow categories of users located in disaster

zones or users that utilize reuse water and are not attempting to demonstrate that

the amount of water discharged into the sewerage system is different than the

amount of water supplied.  Id. at 9–10 (citing Government of Korea's First Supp.

Questionnaire Resp. (July 16, 2020) at Exhibit SEWER-1 (Revised), PR 95–101).

Commerce reasoned that Appendix 4 applies only to subparagraphs (1)–(6) of

Article 21 (Reduction and Exception) of the Ordinance and not subparagraph (7),

which covers "[o]ther instances where the public sewerage management authority

acknowledges public interest or any other special conditions."  Id. at 10; see

Government of Korea's First Supp. Questionnaire Resp. at Exhibit SEWER-1

(Revised) at 8–10.  For Hyundai Steel, the reduction was based on a study Hyundai

Steel submitted to the Government of Korea that demonstrated the amount of water

that Hyundai Steel discharged into the public sewerage system.  <u>Remand Results</u> at

9.  Commerce determined that "[t]his reduction percentage, therefore, reflects the

intent of the federal and municipal regulations that Hyundai Steel be billed based

on the amount of water discharged into the sewerage system."  <u>Id.</u>  Commerce

noted that on remand it reopened the record and received new information

demonstrating that Hyundai Steel was not unique in receiving a sewerage fee

reduction, and that many companies qualified for a similar fee reduction under

Korean law.  <u>Id.</u> at 10 (citing Government of Korea's Resp. Suppl. Questionnaire

(Mar. 8, 2023) at 3, PRR 3.  Commerce concluded that:

> Therefore, after a reevaluation of the record, we find that the record
> does not support a finding that this program is countervailable.
> Specifically, we determine that the record does not support a finding
> that the reduction in Hyundai Steel's sewerage fee in Incheon
> represents revenue foregone, in accordance with section 771(5)(D)(ii)
> of the Act. . . .   Accordingly, there is no revenue foregone to the
> [Korean] government because Hyundai Steel is simply billed for the
> service which it has used, according to the regulations that govern the
> applicable fees.

<u>Id.</u> at 10–11.

No party challenges Commerce's <u>Remand Results</u> regarding the sewerage

fees program.  Hyundai Steel and Defendant contend that Commerce's <u>Remand</u>

<u>Results</u> are supported by substantial evidence and should be sustained.  Pl.'s Br. at

3; Def.'s Br. at 4.  The Court observes that the document provided by the Government of Korea on March 8, 2023 confirms Commerce's determination that numerous companies qualified for sewerage fee reductions similar to that received by Hyundai Steel.  See Government of Korea's Resp. Suppl. Questionnaire at 3. The Court concludes that Commerce reevaluated applicable Korean laws, reopened the record to consider new information, and cited to sufficient record evidence to support Commerce's remand determination that Hyundai Steel did not receive a unique Sewerage Usage Fees reduction constituting a financial contribution and countervailable benefit to Hyundai Steel.  Because Commerce's Remand Results with respect to the Sewerage Usage Fees Program are in accordance with law and supported by substantial evidence, the Court sustains Commerce's Remand Results on this issue.

## CONCLUSION

For the aforementioned reasons, the Court sustains Commerce's determinations that the free provision of port usage rights associated with the Port of Incheon Program conferred a countervailable benefit and Commerce's determination that the Sewerage Usage Fees Program did not constitute a countervailable benefit.

Accordingly, it is hereby

**ORDERED** that the <u>Remand Results</u> are sustained; and it is further

**ORDERED** that judgment will issue accordingly.


                                              ___/s/ Jennifer Choe-Groves
                                              Jennifer Choe-Groves, Judge

Dated:   __August 21, 2023___
              New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

HYUNDAI STEEL COMPANY,

     Plaintiff,

v.

UNITED STATES,

     Defendant,

and

NUCOR CORPORATION, SSAB
ENTERPRISES, LLC, and STEEL
DYNAMICS, INC.,

     Defendant-Intervenors.

**Before:  Jennifer Choe-Groves, Judge**

**Court No. 21-00536**

## JUDGMENT

     This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision; now therefore, in conformity with said decision, it is hereby

     **ORDERED** that the U.S. Department of Commerce's <u>Final Results</u> in <u>Certain Hot-Rolled Steel Flat Products from the Republic of Korea</u>, 86 Fed. Reg. 47,621 (Dep't of Commerce Aug. 26, 2021) (final results of countervailing duty admin. review; 2018), <u>as amended</u>, Final Results of Redetermination Pursuant to Court Remand, ECF No. 48-1, are sustained and judgment is entered for Defendant.

                                        ____/s/ Jennifer Choe-Groves____
                                        Jennifer Choe-Groves, Judge

Dated:   __August 21, 2023__
       New York, New York

C-580-884
Remand
Slip Op. 23-15
POR: 01/01/2018 – 12/31/2018
**Public Document**
E&C/OV: Team

*Hyundai Steel Company v. United States,*
**Court No. 21-00536, Slip Op. 21-15 (CIT February 10, 2023)**
**Certain Hot-Rolled Steel Flat Products from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (CIT) issued on February 10, 2023.[1]  These final results of redetermination concern

Commerce's final results in the administrative review of the countervailing duty (CVD) order on

certain hot-rolled steel flat products from the Republic of Korea (Korea) covering the period of

review (POR) January 1, 2018, through December 31, 2018.[2]  At Commerce's request, the CIT

remanded to Commerce its determination to countervail the Reduction for Sewerage Fees

program.  Additionally, the CIT remanded Commerce's benefit determination relating to the

Provision of Port Usage Rights at the Port of Incheon program.

As set forth below, Commerce has reexamined its financial contribution analysis for the

Reduction for Sewerage Fees program and has determined that the program is not

countervailable.  Additionally, Commerce has provided further explanation regarding its

---

[1] *See Hyundai Steel Company v. United States*, Court No. 21-00536, Slip Op. 23-15 (CIT February 10, 2023) (*Remand Order*).
[2] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2018*, 86 FR 47621 (August 26, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

treatment of the Provision of Port Usage Rights at the Port of Incheon program and, in particular, its benefit determination. Commerce's subsidy rate calculation for this program is unchanged. Consequently, for these final results of redetermination, Commerce has revised the overall subsidy rate calculated for Hyundai Steel Company (Hyundai Steel) to be 0.50 percent *ad valorem*.

## II.    BACKGROUND

On December 11, 2019, Commerce initiated a CVD administrative review concerning imports of certain hot-rolled steel flat products from Korea during the period January 1, 2018, through December 31, 2018.[3]  On February 11, 2020, Commerce selected Hyundai Steel as a mandatory respondent in the administrative review.[4]  In the *Preliminary Results*, Commerce determined that Hyundai Steel received countervailable subsidies from the Government of Korea (GOK) under various programs, including the Reduction for Sewerage Fees program and the Provision of Port Usage Rights at the Port of Incheon program.[5]  In the *Final Results*, Commerce continued to countervail both programs.[6]

With respect to the Reduction for Sewerage Fees program, we found that Hyundai Steel received a financial contribution because its reduced sewerage bill reflected revenue forgone within the meaning of section 771(5)(D)(ii) of the Tariff Act of 1930, as amended (the Act), was specific within the meaning of section 771(5A) of the Act, and conferred a benefit within the

---

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 67717 (December 11, 2019); *see also Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 3014 (January 17, 2020) (correcting the formatting for two company names included in the December 11, 2019 notice).
[4] *See* Memorandum, "Respondent Selection," dated February 11, 2020.
[5] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 86 FR 10533 (February 22, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 14-18.
[6] *See Final Results* IDM at Comments 2 and 3.

2

meaning of section 771(5)(E) of the Act.[7]  Commerce calculated a 0.01 percent *ad valorem* subsidy rate for the program.[8]

With respect to the Provision of Port Usage Rights at the Port of Incheon program, we found that Hyundai Steel received a financial contribution in the form of revenue forgone, because the GOK gave Hyundai Steel the right to collect berthing income and harbor facility usage fees which otherwise would have been collected by the GOK.[9]  We found the program to be specific under section 771(5A)(D)(iii)(I) of the Act because the actual recipients were limited in number, and we determined that a benefit existed under section 771(5)(E) of the Act in the amount of the fees that Hyundai Steel was entitled to collect.[10]  For the *Final Results*, Commerce calculated a 0.01 percent *ad valorem* subsidy rate for the program.[11]

Hyundai Steel filed suit at the CIT challenging Commerce's findings regarding the countervailability of the Reduction for Sewerage Fees program and the Provision of Port Usage Rights at the Port of Incheon program.  Commerce requested a voluntary remand regarding the Reduction for Sewerage Fees program.  On February 10, 2023, the CIT issued its *Remand Order*, granting Commerce's request for a voluntary remand to reconsider our affirmative countervailability finding for the Reduction for Sewerage Fees program.[12]

The CIT also remanded Commerce's benefit determination relating to the Provision of Port Usage Rights at the Port of Incheon program.  Specifically, the CIT found that Commerce failed to consider information "regarding adequate remuneration for port usage in relation to the prevailing market conditions, such as price, quality, availability, marketability, transportation,

---

[7] *See Preliminary Results* PDM at 14-16, unchanged in *Final Results* IDM at Comment 3.
[8] *See Final Results* IDM at 7.
[9] *Id.* at Comment 2.
[10] *Id.*
[11] *Id.* at 7.
[12] *See Remand Order* at 11-12.

Filed By: Kelsie Hohenberger, Filed Date: 4/10/23 11:44 AM, Submission Status: Approved

and *other conditions of purchase or sale*" and failed to provide "an analysis of the record evidence to determine that the Government of Korea provided usage of the port for less than adequate remuneration."[13]  As a result, the CIT found Commerce's determination that the Provision of Port Usage Rights at the Port of Incheon constituted a benefit was not supported by substantial evidence.[14]

During the course of this remand segment, Commerce reopened the administrative record to place public information on the record.[15]  Commerce also issued a supplemental questionnaire to the GOK regarding the Reduction for Sewerage Fees program because we did not collect certain information during the underlying review.[16]  The GOK timely responded to Commerce's supplemental questionnaire.[17]

Commerce released the Draft Results on March 16, 2023, finding that the Reduction for Sewerage Fees program is not countervailable and providing additional explanation as to why the Provision of Port Usage Rights at the Port of Incheon program confers a benefit.[18]  Nucor Corporation (Nucor) and Hyundai Steel submitted comments on the Draft Results on March 23, 2023.[19]

---

[13] *Id.* at 10 (internal citations omitted, emphasis in original).

[14] *Id.*

[15] *See* Memorandum, "Placement of New Factual Information on the Record," dated March 2, 2023 (NFI Memorandum).

[16] *See* Commerce's Letter, "Supplemental Questionnaire," dated March 2, 2023.

[17] *See* GOK's Letter, "Response to the Supplemental Questionnaire," dated March 8, 2023 (GOK March 8, 2023 SQR).

[18] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Company v. United States*, Court No. 21-00536, Slip Op. 23-15 (CIT February 10, 2023), dated March 16, 2023 (Draft Results).

[19] *See* Nucor's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated March 23, 2023 (Nucor Comments); and Hyundai Steel's Letter, "Hyundai Steel's Comments on Draft Remand Redetermination," dated March 23, 2023 (Hyundai Steel Comments).

4

### III.    ANALYSIS

### A.  Reduction for Sewerage Fees

Based on the record evidence and our understanding of the program at the time of the *Final Results*, Commerce found the Reduction for Sewerage Fees program to be countervailable.[20]  However, after gaining an increased understanding of how companies could receive a reduction in sewerage fees pursuant to this program, Commerce found the program to not be countervailable in the subsequent administrative review of this order, covering the period January 1, 2019, through December 31, 2019.[21]  For the purposes of these final results of redetermination, we reconsidered the record evidence in the 2018 administrative review, along with the information provided in the GOK's supplemental questionnaire response, and find that the program is not countervailable.

There are both federal and municipal level laws and regulations governing this program. At the federal level, the legal basis for the collection of sewerage fees is found under Article 65(1) of the Sewerage Act and Article 36(2) of the Enforcement Decree of the Sewerage Act.[22] Article 65(1) of the Sewerage Act stipulates that regional or local governments shall set how usage fees are calculated in their ordinances.[23]  Article 36(2) of the Enforcement Decree of the Sewerage Act states:

> When the public sewerage management authority determines the amount of the usage fee pursuant to Article 65(1) of the Act, it shall do so based upon the

---

[20] *See Final Results* IDM at Comment 3.

[21] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 27570 (May 9, 2022), and accompanying IDM at Comment 6 ("In our Post-Preliminary Analysis Memorandum, we determined that the program for the reduction in sewerage usage fees in the city of Incheon was not countervailable. … After reviewing the information on the record, and consistent with previous determinations in other proceedings, we agree with the GOK that the reduction of sewerage usage fees in Pohang is, likewise {*i.e.*, consistent with our treatment of the Incheon sewerage program}, not countervailable.").

[22] *See* GOK's Letter, "Response to the Countervailing Duty Initial Questionnaire," dated March 30, 2020 (GOK March 30, 2020 IQR), at 138.

[23] *Id.*

Barcode:4363743-01 C-580-884 REM - Remand - Slip Op. 23-15

amount of sewage that relevant users send down through the public sewerage system and the quality and usage pattern of the sewage within the aggregate amount of the maintenance expense for the relevant public sewerage system, depreciation costs, interest on borrowings for relevant facilities, and other expenses that incur to continue the business.[24]

At the municipal level, Articles 12, 14, and 21 of the Incheon Metropolitan City Ordinance on Sewerage System Use stipulate the method for calculating the sewerage fee and any reductions or exemptions to be used in calculating the applicable usage fee.[25]  Article 9 of the Enforcement Regulation on the Incheon Metropolitan City Ordinance on Sewerage System Use identifies the process by which companies apply for a reduction to their sewerage fees.[26]  To qualify for this program in Incheon, companies or households must submit an application to their local government authority.[27]

Article 14(1) of the Incheon Metropolitan City Ordinance on Sewerage System Use states that fees for sewage disposed will be calculated based on the amount of water supplied to the user.[28]  The GOK explained that this calculation methodology is used because users "normally do not have gauging meters installed for measuring the amount of sewage water that they have sent down through the public sewerage system, but only have gauging meters installed for measuring the supply of clean water that they receive from the public water supply system."[29]

Hyundai Steel reported that it received a reduction of its sewerage fees in Incheon under Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewerage System Use, which required submission of an application for a reduction pursuant to Article 9 of the enforcement

---

[24] *Id.*
[25] *Id.* at 139; and GOK's Letter, "The Republic of Korea's Response to the Countervailing Duty First Supplemental Questionnaire," dated July 16, 2020 (GOK July 16, 2020 SQR), at Exhibit SEWER-1 (Revised).
[26] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).
[27] *Id*.
[28] *Id.*
[29] *See* GOK March 30, 2020 IQR at 133.

6

decree regulation of the same ordinance, as referenced above.[30]  Hyundai Steel's application was accompanied by a report that determined that Hyundai Steel's volume of discharge into the sewerage system was less than the volume of water supplied to Hyundai Steel.[31]  Specifically, this report ascertained the difference between the volume of wastewater ultimately sent through the sewerage system and the total volume of water consumed by Hyundai Steel,[32] *i.e*., to account for water that is vaporized during Hyundai Steel's production process and, thus, is not discharged into the sewerage system.[33]

In the *Final Results*, we stated, "the legal provision relating to the Incheon Metropolitan City Ordinance on Sewerage System {Use}, does not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged."[34]  However, upon further consideration, we now find that both federal and municipal laws and regulations state that sewerage fees shall be based on the volume of sewage discharged into the public sewerage system.

As detailed above, at the federal level, Article 36(2) of the Enforcement Decree of the Sewerage Act states that, when a public sewerage management authority determines the sewerage usage fee, "it shall do so based upon the amount of sewage that relevant users send down through the public sewerage system."[35]  The Incheon Metropolitan City Ordinance on Sewerage System Use contains very similar language:  Article 12(2) stipulates that the "public sewerage system fee shall be imposed and collected … based on the volume of sewage

---

[30] *See* Hyundai Steel's Letter, "Hyundai Steel's Initial Questionnaire Response," dated April 9, 2020 (Hyundai Steel April 9, 2020 IQR), at 56 and Exhibits G-21 and G-24.
[31] *See* GOK March 30, 2020 IQR at 141 and SEWER-4.
[32] *Id.* at SEWER-4; *see also* Hyundai Steel's Letter, "Hyundai Steel Case Brief," dated July 2, 2021 (Hyundai Steel Case Brief), at 20-21.
[33] *See* Hyundai Steel April 9, 2020 IQR at 57.
[34] *See Final Results* IDM at Comment 3.
[35] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).

7

discharged into the public sewerage system … ."[36]  Because it is not possible for municipalities to measure accurately the amount of sewage discharged into the public sewerage system due to the lack of gauges discussed above, the municipalities have attempted to estimate the amount of water discharged into the sewerage systems by tying that amount to the amount of water supplied to the user.

We previously determined in the *Final Results* that the laws and regulations "do not prescribe for the situation under which Hyundai Steel qualified for its sewerage fee reduction, or the amount of the reduction received by Hyundai Steel" and that "Article 21, or any other legal provisions cited by the GOK, do not explicitly provide that entities may claim a reduction in their overall water bill with regard to the amount of sewage water discharged."[37]  However, the record demonstrates that Hyundai Steel applied for the reduction under Article 21(1)(7) of the Incheon Metropolitan City Ordinance on Sewerage System Use.[38]  While subparagraphs 1 through 6 of Article 21(1) reference specific circumstances under which users can qualify for a reduction, Article 21(1)(7) is a catch-all clause that states that a reduction can be granted in "{o}ther instances where the public sewerage management authority acknowledges public interest or any other special conditions."[39]  Further, although Article 21 does not explicitly mention a reduction based on the volume of water discharged by a participating company, it appears that such a reduction would not be excluded under the broadly defined language of Article 21(1)(7).

---

[36] *Id.*
[37] *See Final Results* IDM at Comment 3 (citing *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; Calendar Year 2018*, 85 FR 84296 (December 28, 2020) (*CTL Plate from Korea 2018*), and accompanying IDM at Comment 6).
[38] *See* Hyundai Steel April 9, 2020 IQR at 56.
[39] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).

8

Additionally, in the *Final Results*, we reasoned that "the amount of the fee reduction that Hyundai Steel received on its overall water bill significantly exceeds the rate adjustments that are specified in the ordinance, with the exception of certain special conditions, such as being located in a disaster area."[40] The rate adjustments referenced in the quotation relate to rates that are specified in Appendix 4 of the Incheon Metropolitan City Ordinance on Sewerage System Use.[41] There are four different adjustment rates in this appendix: one rate for residential users; one rate for users in disaster areas; one rate for users that have installed a gray water system; and one rate for users that utilize reuse water from the public sewerage system.[42] The disaster area adjustment rate is 100 percent, while the gray water system and reuse water adjustments are both 20 percent.[43] Article 21(2) stipulates that the adjustment rates in Appendix 4 apply to subparagraphs 1-6 of Article 21(1); thus, Appendix 4 does not apply to reductions, like the one received by Hyundai Steel, granted under Article 21(1)(7).[44] Specifically, in the case of Hyundai Steel, the reduction was based on a study it submitted (and the government accepted) that demonstrates the volume of water Hyundai Steel discharged into the public sewerage system. This reduction percentage, therefore, reflects the intent of the federal and municipal regulations that Hyundai Steel be billed based on the amount of water discharged into the sewerage system. The reductions specified in Appendix 4 are for very specific categories of users, *e.g*., for users located in a disaster zone or those that utilize reuse water that are not attempting to demonstrate that the amount of water discharged into the sewerage system is different than the amount of

---

[40] *See Final Results* IDM at Comment 3 (citing *CTL Plate from Korea 2018* IDM at Comment 6).
[41] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).
[42] *Id.*
[43] *Id.*
[44] *Id.*

9

water supplied.  Accordingly, it is logical that Appendix 4 only applies to the narrow categories stipulated in subparagraphs 21(1)(1)-(6) and not 21(1)(7).

Moreover, in the *Final Results*, we determined that the basis on which "Hyundai Steel received a sewerage fee reduction during the POR is an arrangement unique to the respondent and not otherwise contemplated under the provisions of Korean law on our record."[45]  Following the receipt of further information in the GOK's supplemental questionnaire response, such a conclusion is no longer supported by the record.  The record demonstrates that Hyundai Steel was not unique in receiving support under Article 21(1)(7).  Instead, the record shows that many companies qualified for a reduction under Article 21(1)(7).[46]  Accordingly, we find that Hyundai Steel's sewerage fee reduction was not an arrangement unique to Hyundai Steel.

Further, we also do not find that the record supports a finding that the process used by Hyundai Steel to qualify for this reduction was an *ad hoc* arrangement.  Article 9 of the Enforcement Regulation on the Incheon Metropolitan City Ordinance on Sewerage System Use describes the government's process for evaluating applications submitted for a reduction under Article 21 of the Incheon Metropolitan City Ordinance on Sewerage System Use.[47]  In accordance with Article 9 of the enforcement regulation, Hyundai Steel submitted an application using the appropriate form with the required supporting documentation,[48] and the government conducted an assessment of that application and granted its approval.[49]

Therefore, after a reevaluation of the record, we find that the record does not support a finding that this program is countervailable.  Specifically, we determine that the record does not

---

[45] *See Final Results* IDM at Comment 3 (citing *CTL Plate from Korea 2018* IDM at Comment 6).
[46] *See* GOK March 8, 2023 SQR at 3.
[47] *See* GOK July 16, 2020 SQR at Exhibit SEWER-1 (Revised).
[48] *See* Hyundai Steel April 9, 2020 IQR at Exhibit G-24.
[49] *Id*. at Exhibits G-21 and G-22.

support a finding that the reduction in Hyundai Steel's sewerage fee in Incheon represents

revenue forgone, in accordance with section 771(5)(D)(ii) of the Act.  As discussed above, both

federal and municipal regulations stipulate that sewerage fees shall be set according to the

amount of sewage a user discharges into the public sewerage system.  Hyundai Steel qualified

for a reduction in its sewerage bill by demonstrating to the government that it did not discharge

into the public sewerage system a portion of the water it consumed.  Hyundai Steel complied

with the municipal regulations by submitting an application for a reduction, citing a

subparagraph of the ordinance that does not exclude such a reduction, and providing supporting

evidence, which was reviewed and accepted by the government, regarding the volume of water

discharged into the sewerage system.  Accordingly, there is no revenue forgone to the

government because Hyundai Steel is simply billed for the service which it has used, according

to the regulations that govern the applicable fees.

Because our analysis of the record and relevant Korean legal provisions demonstrates that

the GOK did not provide a financial contribution under section 771(5)(D)(ii) of the Act in

connection with Hyundai Steel's reduction in sewerage fees, Commerce has not further

evaluated the countervailability of the program in terms of specificity under section 771(5A) of

the Act or benefit under section 771(5)(E) of the Act.

### B. Provision of Port Usage Rights at the Port of Incheon

In the *Remand Order*, the CIT remanded for further consideration Commerce's benefit

determination relating to the Provision of Port Usage Rights at the Port of Incheon.  The CIT

found that Commerce erred when it did not provide an analysis "regarding adequate

remuneration for port usage in relation to the prevailing market conditions, such as price, quality,

availability, marketability, transportation, and *other conditions of purchase or sale*," and did not

11

provide an analysis of the record evidence to determine that the GOK provided usage of the port for less than adequate remuneration (LTAR).[50]  Below, we provide additional explanation to support Commerce's position that its benefit analysis was consistent with the Act and CVD regulations, and that the analysis corresponded with the facts of the underlying review. Specifically, we explain why:  (1) it would not be appropriate to analyze the port usage rights program in terms of adequacy of remuneration; and (2) the Act and regulations do not contemplate consideration of the "conditions of purchase or sale" and/or an alleged "excessive benefit" standard with respect to the subsidy program at issue.

> 1. Commerce analyzed this program as revenue forgone and not in terms of adequacy of remuneration.

Given the nature of the program, the Provision of Port Usage Rights at the Port of Incheon as examined in this proceeding is not a subsidy that is appropriately analyzed under an LTAR analysis.[51]  Here, Hyundai Steel and the GOK's Ministry of Oceans and Fisheries entered into an agreement regarding the construction of a port at North Incheon Harbor in August 2001 and a revised agreement in April 2009.[52]  Under this program, the GOK partnered with a private company (*i.e.*, Hyundai Steel) for the construction of harbor facilities under a build-transfer-operate agreement pursuant to the Act on Private Participation in Infrastructure.  Pursuant to the agreement, Hyundai Steel financed the construction and, pursuant to Korean law, ownership of the port facility reverted to the GOK in January 2007.[53]  Hyundai Steel received funds from the GOK between 2004 and 2007 for certain construction costs.[54]  Additionally, as part of the

---

[50] *See Remand Order* at 10 (citing section 771(5)(E) of the Act, emphasis in original).
[51] Moreover, during the underlying review, no interested party argued for an LTAR analysis or submitted benchmark data necessary for Commerce to conduct such an analysis.
[52] *See* Hyundai Steel April 9, 2020 IQR at 42.
[53] *Id.*
[54] The reimbursements provided to Hyundai Steel by the GOK between 2004 and 2007 were expensed in the year of receipt pursuant to 19 CFR 351.524(b)(2) because the amount of the grants (*i.e.*, the benefit) was less than 0.5

agreement, Hyundai Steel was granted a free use period for the port,[55] the right to manage and operate the port,[56] and the use of state-owned or public property within the project site.[57] Further, Hyundai Steel acquired the right to "collect fees from third-party users."[58]  However, no third party has used the harbor.[59]  Although the agreement between Hyundai Steel and the GOK extensively detailed the relationship between the parties, the aspect of the program analyzed (and ultimately countervailed) by Commerce in this review was narrow:  the GOK's assignment to Hyundai Steel of the right to collect certain port fees.

In the underlying administrative review, Commerce considered the financial contribution that Hyundai Steel received pursuant to this program to be revenue forgone.  Specifically, we stated, "the fees that the GOK gave Hyundai Steel the right to collect -- the berthing income and the harbor facility usage fees -- which would otherwise have been collected by the GOK absent the agreement between the parties, represent revenue forgone by the GOK within the meaning of section 771(5)(D)(ii) of the Act."[60]  The CIT's holding did not disturb this finding.  The *Remand*

---

percent of Hyundai Steel's relevant sales value.  Thus, these government payments to Hyundai Steel were not addressed or countervailed in the *Final Results*.
[55] *See* Hyundai Steel's Letter, "Hyundai Steel's Second Supplemental Questionnaire Response," dated January 21, 2021, at 10.
[56] *Id*.
[57] *See* GOK's Letter, "The Republic of Korea's Response to the Countervailing Duty Second Supplemental Questionnaire," dated January 21, 2021, at 7 (noting that investors may receive income "through ancillary business such as usage of the state owned property") and Exhibit PPP-1 ("{T}he project undertaker may use and benefit gratuitously from any State and public properties located in the predetermined area for the private capital inducement project"); *see also generally* Hyundai Steel April 9, 2020 IQR at Exhibit G-1 (Article 6).
[58] *Id*. at 43.
[59] *Id*.
[60] *See Preliminary Results* PDM at 17, unchanged in *Final Results* IDM at Comment 2 ("The GOK provided the benefit for this program through reimbursements as well as *forgoing revenue that the GOK was otherwise entitled to collect, such as berthing fees and other user fees*.") (emphasis added).  As noted above, the GOK also provided reimbursements in the form of grants pursuant to this program, but these grants were expensed well before the POR, and are inapplicable to Commerce's benefit analysis here.

*Order* correctly stated, "Hyundai Steel challenges only Commerce's benefit determination and does not challenge Commerce's determinations as to financial contribution and specificity."[61]

> a.  *The Act and the SAA[62] distinguish between an LTAR analysis and revenue forgone analysis.*

The *Remand Order* states that Commerce's analysis was not supported by substantial evidence because Commerce did not consider the criteria laid out in section 771(5)(E) of the Act.[63]  However, this conclusion is inconsistent with our actual financial contribution analysis, which was conducted pursuant to section 771(5)(D)(ii) of the Act, and not applicable to the language referenced in section 771(5)(E) of the Act.  Specifically, in remanding the issue to Commerce, the *Remand Order* cited statutory language relating to the determination of a benefit under section 771(5)(E) of the Act with respect to "prevailing market conditions."[64]  That exact language does not apply to programs analyzed as revenue forgone, but instead applies "{f}or purposes of clause (iv)," which relates to a subsidy analysis "in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration."  Specifically, the Act states:

> {f}or purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.[65]

---

[61] *See Remand Order* at 6.
[62] *See* Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act (URAA), H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 927.
[63] *See Remand Order* at 10.
[64] *Id*.
[65] *See* section 771(5)(E) of the Act.

14

Thus, the statutory language of section 771(5)(E) of the Act only applies to programs in which a government provides a financial contribution within either the meaning of section 771(5)(D)(iii) of the Act (the provision of goods or services, other than general infrastructure) or section 771(5)(D)(iv) of the Act (the purchase of goods).  It does not apply to subsidy programs analyzed under the revenue forgone provision, section 771(5)(D)(ii) of the Act.

This interpretation of the language of section 771(5)(E) is supported by the legislative history of the provision – specifically the SAA.[66]  The SAA is explicit that the benefit standards set forth within section 771(5)(E)(iv) of the Act, "less than adequate remuneration" and "more than adequate remuneration," are only relevant with respect to the provision of goods or services. The SAA states, in relevant part:

> {w}ith respect to the provision of goods or services, current law relies on a standard of 'preferentiality' to determine the existence and amount of a benefit. *Section 771(5)(E)(iv) {of the Act} replaces this standard with the standards from Article 14 of the Subsidies Agreement – 'less than adequate remuneration' (in the case of the provision of goods or services) and 'more than adequate remuneration' (in the case of procurement of goods).*[67]

Accordingly, the language of both section 771(5)(E) of the Act and the SAA supports the notion that the language at issue only applies to a financial contribution in the form of the provision of a good or service (or the government purchase of a good) and is inapplicable to the provision of a financial contribution in the form of revenue forgone.[68]

---

[66] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d); *see also Bosun Tools Co., Ltd. v. United States*, Court No. 21-1929 (Fed. Cir. 2022).

[67] *See* SAA at 927 (emphasis added).

[68] *See, e.g.*, sections 771(5)(D)(iii) and 771(5)(E)(iv) of the Act, relating to financial contribution and benefit analysis in the context of LTAR programs, respectively; *see also Nucor Corp. v. United States*, 927 F.3d 1243, 1251 (Fed. Cir. 2019) (noting that "the adequacy-of-remuneration language gives meaning to a provision that asks whether a producer is receiving a 'benefit' from a government authority (through sales of goods or services), as part of the definition of what counts as a 'subsidy'") (citing sections 771(5)(A) and (B) of the Act)).

15

     *b.   An LTAR analysis and a revenue forgone analysis cannot be*
*simultaneously applied to a subsidy program; either one, or the other,*
*applies, and in this case, a revenue forgone analysis was appropriate.*

There are stark differences between programs that are analyzed under an LTAR analysis

and those considered under a revenue forgone analysis, which would explain why the Act and

SAA distinguish between these types of programs.  For example, an LTAR analysis relies on the

application of a benchmark, whereby Commerce conducts a comparison to determine whether a

good or service is provided for LTAR.[69]  However, with respect to financial contributions such

as grants or revenue forgone, there is no need or basis to apply a benchmark to determine

whether a benefit is conferred, because the benefit is the amount of the grant or the amount of the

government fee that otherwise would have been paid in the absence of the program.  In other

words, unlike in an LTAR analysis, when Commerce conducts a revenue forgone analysis, there

is no need for the agency to select a benchmark to determine whether there is a benefit and no

need for the agency to use a benchmark to ascertain the amount of the benefit.  Thus, the criteria

which Commerce should consider in analyzing a subsidy program under an LTAR analysis is, by

necessity, different from the criteria which Commerce should consider in analyzing a subsidy

program under a revenue forgone analysis.

     For the purposes of this case, Commerce did not conduct an LTAR analysis because such

an analysis would be inappropriate in light of the facts and nature of the subsidy program at

issue.  As explained above, Hyundai Steel received funds from the GOK between 2004 and 2007

for certain construction costs, but Hyundai Steel reported no costs or payments for this POR, and

---

[69] Under 19 CFR 351.511, the preferences for a benchmark price are:  (1) a market-determined price for the good or service resulting from actual transactions in the country under investigation; and (2) absent market-determined prices within the country under investigation, Commerce will use world market prices for that good or service as the benchmark to determine whether the government good or service is being provided at adequate remuneration. Finally, if there are no benchmarks available under (1) and (2), Commerce will assess whether the government price is consistent with market principles.

Filed By: Kelsie Hohenberger, Filed Date: 4/10/23 11:44 AM, Submission Status: Approved

no party alleged the provision of a good or service by the GOK during the POR or in prior segments of this proceeding.[70]  Rather, the program at issue in this case pertained to Hyundai Steel's right to collect berthing income and other fees associated with port activity during the POR.  Pursuant to its analysis of that program, specifically, Commerce countervailed the GOK's assignment to Hyundai Steel the ability to collect certain port fees.  The ability to collect such fees (*i.e.*, fees otherwise payable to the government) cannot be construed as the provision of a good or service but is instead revenue forgone.[71]

> c. *Various types of subsidies may relate in some way to a good or a service, but that does not necessarily mean that the application of an LTAR analysis is appropriate to those subsidies.*

We recognize that certain subsidy programs may bear a relationship to a good or service, but that does not mean that an LTAR analysis applies to those programs or that the government was providing a financial contribution to the recipient in the form of the provision of a good or service.  For example, Commerce has countervailed grant and loan programs that are provided to support research and development activities and assist recipients to purchase goods and services.[72]  Similarly, we have countervailed tax exemptions related to research and

---

[70] *See* Hyundai Steel April 9, 2020 IQR at 42.

[71] While the non-payment of a government-set or mandated fee or charge, like the port charges at issue here, represents the provision of a financial contribution in the form of revenue forgone, Commerce does recognize that a government fee or charge paid by a respondent company with respect to the provision of a good or service, under certain circumstances, can be considered a financial contribution within the meaning of section 771(5)(D)(iii) of the Act.  However, such circumstances were not present in the underlying *Final Results*.  No interested party made an allegation with respect to the provision of port services for LTAR.  There is nothing on the record that indicates that port fees established by the GOK are set at a rate that is for LTAR; additionally, there is no information on the record regarding whether the companies that pay port fees would constitute a specific group under section 771(5A) of the Act.  Therefore, there is no basis to conclude that the GOK is providing port services for LTAR.

[72] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate from India, Indonesia, and the Republic of Korea: Final Results of Expedited Third Sunset Reviews of Countervailing Duty Orders*, 82 FR 16790 (April 6, 2017), and accompanying IDM at "Nature of the Subsidy" ("The GOK provides research and development grants to support numerous projects pursuant to the Industrial Development Act, including technology for core materials, components, and engineering systems, and resource technology.").

17

development, investment, and the purchase of capital assets and goods.[73]  In both of the

illustrative scenarios, the financial contribution – while related to a good or service – did not

constitute a financial contribution to the recipient in the form of the provision of a good or

service.

This interpretation is supported by section 771(5)(D) of the Act, as the direct transfer of

funds (such as grants and loans) are defined as financial contributions under section 771(5)(D)(i)

of the Act and tax exemptions are defined as financial contributions in the form of revenue

forgone under section 771(5)(D)(ii) of the Act.  In contrast, the government provision of a good

or service is separately addressed under section 771(5)(D)(iii) of the Act.  In addition, section

771(5)(E) of the Act provides separate and distinct methodologies for determining whether a

benefit is conferred by a loan (section 771(5)(E)(ii) of the Act) or from the government provision

of a good or service (section 771(5)(E)(iv) of the Act).  Thus, the Act treats grants, loans, and

exemptions from taxes/fees as distinct from the provision of goods and services.

The administrative precedent cited by Hyundai Steel in its submissions to Commerce and

in its briefs to the CIT does not warrant a conclusion to the contrary.[74]  Rather, the cases

reference a financial contribution in the form of revenue forgone or, in some cases, grants.[75]  The

---

[73] *See, e.g.*, *Wire Decking from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 75 FR 32902 (June 10, 2010), and accompanying IDM at 27 (countervailing value-added tax refunds for foreign-invested enterprises purchasing domestically-produced equipment); and *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 FR 40480 (July 15, 2008), and accompanying IDM at 22-23 (countervailing exemptions of value-added tax and tariffs on purchases of imported equipment).
[74] *See* Hyundai Steel Case Brief at 5-8.
[75] *See, e.g.*, *Notice of Final Affirmative Countervailing Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 FR 62102 (October 3, 2002) (*CR from Korea 2000*), and accompanying IDM at Comment 11 ("Therefore, we find that the GOK is providing a financial contribution *in the form of revenue foregone* and that it is specific to Dongbu.") (emphasis added); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013) (*CORE from Korea 2011 Preliminary*), and accompanying PDM at 11 ("Moreover, we preliminarily determine that the GOK is *foregoing revenue that it would otherwise collect* by allowing Dongbu to be exempt from port charges for up to 70 years and, thus, the program constitutes a financial contribution within the

18

cases do not indicate that the subsidy in question was ever analyzed as an LTAR program, and

therefore, the referenced language of section 771(5)(E) of the Act did not apply.

Accordingly, the Act and Commerce's regulations, as well as the facts of this case, all

support the position that an LTAR analysis, and therefore, an analysis under section 771(5)(E) of

the Act, does not apply to the subsidy program at issue in this case. Commerce's treatment of

this program as revenue forgone, which Hyundai Steel did not challenge and the *Remand Order*

did not alter,[76] demonstrates that Commerce's analysis and benefit determination were fully

consistent with the agency's statutory obligations.

> 2. "Conditions of Purchase or Sale" and "Excessive Benefits"

As part of its analysis of Commerce's *Final Results*, the CIT noted that section 771(5)(E)

of the Act requires Commerce to consider "other conditions of purchase or sale."[77] Furthermore,

the CIT cited arguments made by Hyundai Steel that Commerce,

> {s}hould have applied its 'excessive benefit' standard, by which Commerce
> determines that a benefit is conferred only if the period of port usage rights
> provided by the Government of Korea is excessive, and if Commerce had applied
> the 'excessive benefit' standard in the *Final Results*, Commerce would have
> determined that a benefit was not conferred.[78]

---

meaning of section 771(5)(D)(ii) of the Act.") (emphasis added), unchanged in *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2011*, 79 FR 5378 (January 31, 2014) (*CORE from Korea 2011 Final*) (collectively, *CORE from Korea 2011*); *Notice of Final Results of Countervailing Duty Administrative Review: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 FR 38565 (July 13, 2007) (*CTL Plate from Korea 2005*), and accompanying IDM at 6-7 and Comment 1 (finding that the respondent received a "direct financial contribution, in the form of grants, {which} confer a benefit within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act, respectively"); and *Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 64 FR 30636, 30649 (June 8, 1999) (finding the port program in question not specific, while noting that, prior to the specificity determination, Commerce found that "POSCO received the right to use the port facilities free of charge, and *the ability to charge other users a usage fee* until the company recovers all of its investment costs," and explaining that "because POSCO is exempt from paying port facility fees, which it otherwise would have to pay, and *the government is foregoing revenue that is otherwise due*, POSCO's free usage of the port facilities provided a financial contribution to the company within the meaning of section 771(5)(D)(ii) of the Act") (emphasis added).

[76] *See Remand Order* at 6.
[77] *Id.* at 10.
[78] *Id.* at 6-7 (citing Hyundai Steel Case Brief at 11-19).

For the reasons we have explained, the Act and SAA do not require Commerce to conduct an LTAR analysis in addition to its revenue forgone analysis based on the subsidy program at issue in this case.  However, in response to the CIT's *Remand Order*, we are addressing the "other conditions purchase or sale" argument.  In addition, we are also addressing the "excessive benefits" argument raised by Hyundai Steel and referenced by the CIT.[79]

> a. *Commerce was not required to consider the costs incurred by Hyundai Steel in constructing the port for purposes of its analysis of the subsidy program during the POR.*

At the outset, we emphasize that the costs incurred by Hyundai Steel in construction of the port are not considered, *i.e.*, as an offset, in determining the benefit provided by the GOK under the Act or Commerce's regulations.  The only authorized statutory adjustments that may be made in calculating and determining the net countervailable subsidy conferred by this program are set forth within section 771(6) of the Act, which states:

> (6) NET COUNTERVAILABLE SUBSIDY.—For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—
>
> (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
>
> (B) any loss in the value of the countervailable subsidy

---

[79] We acknowledge Commerce's statement in the *Final Results* that "treatment of the benefit received here is further supported by Commerce's regulations at 19 CFR 351.503(b), which states that for other government programs, Commerce normally will consider a benefit to be conferred where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn."  *See Final Results* IDM at Comment 2.  Commerce's quotation of this provision was intended to illustrate the wide range of benefit types that may be considered and countervailed in Commerce's subsidy analysis, and not to suggest that the GOK port program represents the provision of a good or service.  Indeed, it was the final phrase of the quotation – relating to a company's ability to "receive{} more revenues than it otherwise would earn" – that Commerce was highlighting in its discussion.  Here, Hyundai Steel's participation in the GOK's port program permitted it to receive additional revenue, *i.e.*, revenue that was otherwise due to the GOK.

> resulting from its deferred receipt, if the deferral is
> mandated by Government order, and
>
> (C) export taxes, duties, or other charges levied on the
> export of merchandise to the United States specifically
> intended to offset the countervailable subsidy received.

Notably, expenses analogous to Hyundai Steel's costs in constructing the port are not included in

the list of factors Commerce is directed to consider in calculating the net countervailable

subsidy.

Moreover, section 771(5)(C) of the Act states that Commerce is not required to consider

the effect of the subsidy in determining whether a subsidy exists:

> (C) OTHER FACTORS.—The determination of whether a subsidy
> exists shall be made without regard to whether the recipient of
> the subsidy is publicly or privately owned and without regard
> to whether the subsidy is provided directly or indirectly on the
> manufacture, production, or export of merchandise. *The
> administering authority is not required to consider the effect of
> the subsidy in determining whether a subsidy exists under this
> paragraph.* (emphasis added).

Furthermore, 19 CFR 351.503 provides further elaboration with respect to this legal standard.

Under 19 CFR 351.503(c), in determining whether a benefit is conferred, Commerce "is not

required to consider the effect of the government action on the firm's performance, including its

prices or output, or how the firm's behavior is otherwise altered." In addition, the *CVD

Preamble* adds that "{p}aragraph (c) of the { } regulation reinforces this principle by stating

affirmatively that, in determining whether a benefit is conferred, {Commerce} is not required to

consider the effect of the government action on the firm's performance, including its prices or

output, or how the firm's behavior otherwise is altered."[80] Moreover, the SAA states, "the { }

definition of subsidy does not require that Commerce consider or analyze the effect (including

---

[80] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65361 (November 25, 1998) (*CVD Preamble*).

21

whether there is any effect at all) of a government action on the price or output of the class or kind of merchandise under investigation or review."[81]

Thus, under the Act and the CVD regulations, the fact that Hyundai Steel may have altered its behavior or incurred a cost to construct the Incheon port is not a factor which Commerce must consider in determining the benefit conferred upon Hyundai Steel through receipt of the right to collect port usage fees.[82]

The *CVD Preamble* provides additional clarity with respect to this concept using two examples.[83]  First,

> assume that a government puts in place new environmental restrictions that require a firm to purchase new equipment to adapt its facilities.  Assume also that the government provides the firm with subsidies to purchase that new equipment, but the subsidies do not fully offset the total increase in the firm's costs – that is, the net effect of the new environmental requirements and subsidies leaves the firm with costs that are higher than they previously were.[84]

A subsidy still exists, and the imposition of the environmental regulations and the subsidies to help the firm comply with the new environmental requirements are two separate government actions:  "{a} subsidy that reduces a firm's cost of compliance remains a subsidy (subject, of course, to the statute's remaining tests for countervailability), even though the overall effect of the two government actions, taken together, may leave the firm with higher costs."[85]  In addition, the *CVD Preamble* provides a second example on this point.  It states, "if a government

---

[81] *See* SAA at 926.

[82] We also note that – in light of the long-term usage period the GOK provided to Hyundai Steel, and the fact that no other party has used the port to date – construction of the port does not constitute general infrastructure.  *See Certain Uncoated Groundwood Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018), and accompanying IDM at Comment 86 ("The activities performed by Resolute, such as building roads to access harvesting areas on Crown land, were performed in the furtherance of Resolute's harvesting activities, not to render a service to the Government of Ontario.  Because we find Resolute's construction of roads to further its harvesting abilities, we do not find this to be "general infrastructure" as defined under 19 CFR 351.524(d) as infrastructure that is created for the broad societal welfare of a country, region or municipality.").

[83] *See CVD Preamble*, 63 FR at 65361.

[84] *Id.*

[85] *Id.*

22

promulgated safety regulations requiring auto makers to install seat belts in back seats, and then gave the automakers a subsidy to install the seat belts, {Commerce} would draw the same conclusion."[86]

In these two examples, the government action that constitutes the benefit is the subsidy to install the equipment, because the action represents an input cost reduction.  The government action represented by the requirement to install the equipment in the first instance cannot be construed as an offset to the subsidy provided to reduce the costs of installing the equipment.[87] Thus, if a government provides a financial contribution and a firm receives revenues beyond the amount it otherwise would earn, that is the end of the inquiry insofar as the benefit element is concerned.  Commerce need not consider how Hyundai Steel's behavior or costs are altered when it received a financial contribution that lowers its costs or increases its revenues.[88]

> b. *Commerce has no "excessive benefit" standard/practice.*

Hyundai Steel also asserted to the CIT, and to Commerce in the underlying review, that Commerce applies an "excessive benefit" standard when determining whether to countervail infrastructure-related programs that result in the provision of rights and/or reimbursement to private parties, such as in the context of public-private port construction in Korea.[89]  Hyundai Steel alleged that, under this precedent, it is Commerce's practice to find that the government provision of port usage rights provides a benefit where the applicable benefit stream lasts longer than the average useful life (AUL) of the underlying asset, and that where the exemption/fee-

---

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *See* Hyundai Steel Case Brief at 2-18; *see also Remand Order* at 6-7 (stating that "Hyundai Steel argues that Commerce should have applied its 'excessive benefit' standard, by which Commerce determines that a benefit is conferred only if the period of port usage rights provided by the Government of Korea is excessive" and asserting that "if Commerce had applied the 'excessive benefit' standard in the *Final Results*, Commerce would have determined that a benefit was not conferred").

collection period is equal to or greater than the AUL period, the subsidy is "excessive" and represents a benefit.[90]

The implication of Hyundai Steel's argument is that, when a government provides benefits for such a lengthy period, it results in the constructive ownership of the underlying assets.[91]  Accordingly, in its examination of Commerce precedent, Hyundai Steel asserted that the 50-70 year periods involved in cases such as *CR from Korea 2000* and *CTL Plate from Korea 2005* were found to be excessive because they were equal to or exceeded the AUL periods for the assets, and effectively granted ownership to the respondent.[92]  In contrast, Hyundai Steel argued that the duration of the agreement between Hyundai Steel and the GOK in this case was for less time (approximately 42 years), and therefore, did not result in a countervailable benefit.

Commerce fundamentally disagrees with Hyundai Steel's characterization of an alleged "excessive benefit" standard and practice.  Moreover, even if such an analysis did exist, applying this framework of analysis would not lead to a different result in this case.

First, it should be clear from the explanation of benefit, subject to section 771(5)(C) of the Act and 19 CFR 351.503 provided above, that application of an "excessive benefit" standard would be inconsistent with both the Act and the CVD regulations with regard to the determination of the benefit conferred by a government financial contribution.  Once Commerce has determined that a benefit exists, Commerce is not required to assess the costs or modified business practices that resulted from the provision of the subsidy – *i.e.*, it is not required to

---

[90] *See* Hyundai Steel Case Brief at 5 (citing *CR from Korea 2000* IDM at Comment 11).
[91] *Id.* at 6-7.
[92] *Id.* at 5-7 (citing *CR from Korea 2000* IDM at Comment 11; and *CTL Plate from Korea 2005* IDM at Comment).

24

consider the effects of the subsidy. Thus, Hyundai Steel's cost are not pertinent to the question of whether the subsequent subsidization from the GOK[93] constitutes a benefit.

Moreover, although the CIT found that the record of the instant case differs from *AK Steel Corp.*,[94] Commerce believes *AK Steel Corp.* supports the benefit analysis, as described above, because the U.S. Court of Appeals for the Federal Circuit (CAFC) sustained Commerce's prior determination to reject similar arguments that the exemption of port fees was merely a reimbursement by the GOK for costs incurred in building the port, and that the relevant fee exemptions provided a countervailable benefit regardless of who built the port.[95]

Second, Hyundai Steel mischaracterized key holdings in the prior cases. For instance, Commerce determined in *CR from Korea 2000* that, "as only Dongbu has received a 70 year exemption period, we find this excessive exemption period is *specific* to Dongbu under {section} 771(5A)(D)(iii)(I) of the Act."[96] In the 2011 administrative review of the CVD order on CORE from Korea, Commerce determined that "the program is specific under section 771(5A)(D)(iii)(I) of the Act because the excessive exemption period of 70 years is limited to Dongbu."[97] Thus, the "excessive" period related to Commerce's determination of specificity, not to the calculation of benefit.[98] In the *Final Results* of this review, in contrast, Commerce did not rely on the length

---

[93] As discussed above, such subsidization relates to the right to collect certain fees and, in prior periods not relevant for this POR, grants from the GOK.

[94] *See Remand Order* at 8-9 ("Although the salient facts recounted in *AK Steel Corp.* may be similar to the facts in this case, the standard of review is whether Commerce's benefit determination is supported by substantial evidence, and the instant case differs from *AK Steel Corp.* in the evidence on the administrative record.") (citing *AK Steel Corp. v. United States*, 192 F. Supp. 1367, 1379-82 (Fed. Cir. 1999) (*AK Steel Corp.*)).

[95] *See AK Steel Corp.*, 192 F. Supp. at 1379-82.

[96] *See CR from Korea 2000* IDM at 21 (emphasis added).

[97] *See CORE from Korea 2011 Preliminary* PDM at 11, unchanged in *CORE from Korea 2011 Final.*

[98] We note that a countervailable subsidy is determined by making three different determinations based on three different analyses. Commerce must ask if there is a financial contribution, if that financial contribution provided a benefit, and if that subsidy is specific. The "excessive" period analysis pertained to a specificity analysis, not a benefit analysis, and this conclusion is further supported by Commerce's explanation of the benefit calculation in those cases, which did not make reference to any proportional assignment of a benefit based on what was deemed "excessive." *See, e.g.*, *CR from Korea 2000* IDM at Comment 11 ("As noted earlier, the benefit is the full amount

25

of the exemption period as the basis for a specificity finding because the program was found to be specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients were limited in number.

Commerce has, in the past, observed that usage agreements for port facilities that cover a sufficiently long period of time (*e.g.*, from 50 to 70 years) effectively render "ownership" of the port facilities to the respondent company.[99]  Such observations were made by Commerce in response to arguments that the GOK owned the port facilities as required under Korean law.[100] However, as discussed with respect to the determination of benefit set forth under section 771(5)(C) of the Act and 19 CFR 351.503, and the statutory requirement under section 771(5)(E) of the Act that the determination of a benefit will be based on the benefit to the recipient, the actual ownership of the port facilities is not relevant in determining and calculating the benefit provided to Hyundai Steel under this program.  The *CVD Preamble* clearly states with respect to the CVD benefit regulation at 19 CFR 351.503:

> if there is a financial contribution and a firm pays less for an input than it would otherwise pay in the absence of that financial contribution, *or receives revenues beyond the amount it would earn, that is the end of the inquiry as the benefit element is concerned.*[101]

Third, even assuming *arguendo* that the standard proposed by Hyundai Steel were applicable to the context of this case, the outcome would still be to countervail the program.  The Hyundai Steel-GOK agreement here provides that "Hyundai Steel was granted port usage rights

---

of the yearly exemption provided to Dongbu under this program."); *CORE from Korea 2011 Preliminary* PDM at 11 ("Further, we preliminarily determine that the exemptions confer a benefit under section 771(5)(E) of the Act in the amount of the port charges that were not collected."), unchanged in *CORE from Korea 2011 Final*; and *CTL Plate from Korea 2005* IDM at 7 ("To calculate the benefit under this program, we first summed the amount of payments {respondent} DSM received each year under the program.").

[99] *See, e.g.*, *CTL Plate from Korea 2005* IDM at Comment.
[100] *See, e.g.*, Hyundai Steel Case Brief at 11-14.
[101] *See CVD Preamble*, 63 FR at 65361 (emphasis added).

for the facility it constructed at Incheon Harbor for approximately 41 years and 8 months."[102]
Hyundai Steel, in its financial statements, considered the intangible asset of "exclusive dock use
rights" to have an estimated useful life of 42 years, and also indicated that buildings, structures,
and machinery have estimated useful lives of 15 to 50 years, five to 40 years, and five to 30
years, respectively.[103]  Additionally, the class life period for docks and wharves is 20 years.[104]
Thus, the record indicates that the length of the Hyundai Steel-GOK agreement did, in fact, equal
or exceed the applicable AUL period.

For the reasons stated above, we continue to find that the Provision of Port Usage Rights
at the Port of Incheon program confers a benefit to Hyundai Steel and that the program conferred
a benefit in the amount of 0.01 percent to Hyundai Steel during the POR.

## IV.    COMMENTS ON DRAFT RESULTS OF REDETERMINATION

As noted above, Nucor and Hyundai Steel submitted comments on the Draft Results
regarding Commerce's discussion of the Provision of Port Usage Rights at the Port of Incheon
program.[105]  The comments are addressed, below.

*Hyundai Steel Comments*[106]

- First, Commerce wrongly characterizes the basis for its port rights program
  determination.  Commerce's quotation of 19 CFR 351.503(b) in the *Final Results*, which
  contains language mimicking the adequacy of remuneration language of the Act at
  section 771(5)(E), supports a finding that the program is appropriately analyzed as an
  LTAR program.  Regardless, there is no statutory basis to conclude that consideration of

---

[102] *See* Hyundai Steel April 9, 2020 IQR at 43.
[103] *See* Hyundai Steel's Letter, "Response to Affiliated Companies Section of Initial Questionnaire," dated March 6, 2020, at Exhibit 21.
[104] *See* NFI Memorandum at Attachment.
[105] *See generally* Nucor Comments; and Hyundai Steel Comments.
[106] *See* Hyundai Steel Comments at 2-14.

the "prevailing market conditions" and "other conditions of purchase or sale" only applies to instances where the financial contribution finding is based on the existence of an LTAR or more than adequate remuneration (MTAR) program.[107]

- Here, the "prevailing market conditions" and "other conditions of purchase or sale" are the fact that the GOK's port program provided rights to Hyundai Steel as reimbursement for construction of the port.  Accordingly, Commerce must take into consideration the fact that the GOK's provision of port rights were compensation for Hyundai Steel's construction costs, and that the length of the usage period was calibrated so that Hyundai Steel would recoup its costs and nothing more.  This same principle is also consistent with the principles of *GOSL*, which require Commerce to examine a program in its entirety when evaluating countervailability.[108]

- Second, instead of applying an LTAR analysis to the port program as directed by the CIT, Commerce's Draft Results focus on irrelevant issues.  Consideration of the statutory offset criteria under section 771(6)(A) of the Act is unnecessary, because neither Hyundai Steel nor the CIT asserted that the provision is applicable.  Similarly, discussion of whether Commerce must consider the "effect of the subsidy" under section 771(5)(C) of the Act is unnecessary.  Again, neither Hyundai Steel nor the Court asserted that Commerce is required to consider the effect of the port rights in determining if a countervailable benefit exists.

- Third, Commerce's prior decisions sensibly consider whether the GOK's reimbursement for port construction costs in Korea is excessive.  Consideration of potentially "excessive benefits" in prior cases was essential to Commerce's analyses and had implications

---

[107] *Id.* at 2-5.
[108] *Id.* at 7 (citing *Government of Sri Lanka v. United States*, 308 F. Supp. 3d 1373 (CIT 2018) (*GOSL*)).

28

beyond Commerce's finding of specificity in those scenarios.[109]  Moreover, with respect to *AK Steel Corp.*, the facts of that case are distinct from the facts here; there, the respondent was arguably given free ownership rights, whereas Hyundai Steel was given the right to collect fees.[110]

- Finally, Commerce's application of an excessive benefit standard to the facts of this case is flawed.  Commerce cites various AUL periods in Hyundai Steel's financial statements to argue that the duration of the port rights met or exceeded the AUL periods in question.  However, these AUL periods range from 14 to 50 years and, thus, it is not clear that the 41 year and eight month usage period provided to Hyundai Steel for the port exceeds the AUL period.  More importantly, the AUL period is just one indicator used by Commerce to determine whether the provision of rights by the GOK to Hyundai Steel results in effective ownership of the port and, accordingly, provides an excessive benefit.  Regardless of the length of time for which Hyundai Steel was given the right to collect berthing income and usage fees from other third party users of the port, it was not given any ownership rights to the port.

*Nucor Comments*[111]

- The GOK provided Hyundai Steel with various benefits relating to the company's operation and use of the Incheon wharf:  direct reimbursements from the GOK for certain construction costs; exemptions from paying certain fees to the GOK related to its use of the wharf; and the right to collect fees from shipping operators and third-party users of the wharf, such as berthing income and harbor facility usage fees.  In its appeal, Hyundai

---

[109] *Id.* at 11-13 (citing *CR from Korea 2000* IDM; and *CORE from Korea 2011 Preliminary Results* IDM, unchanged in *CORE from Korea 2011 Final Results*).
[110] *Id.* at 12 (citing *AK Steel Corp.*).
[111] *See* Nucor Comments at 2-6.

Filed By: Kelsie Hohenberger, Filed Date: 4/10/23 11:44 AM, Submission Status: Approved

Steel challenged the countervailability of the third set of benefits, which Commerce countervailed as revenue forgone.

- Section 771(5)(E) of the Act stipulates that, when a benefit takes the form of the provision of goods or services provided for LTAR/MTAR, the adequacy of remuneration shall be determined in relation to prevailing market conditions and the conditions of purchase or sale.  These requirements do not apply where, as here, the benefit clearly does not take the form of the provision of goods or services under section 771(5)(E)(iv) of the Act.

- The CIT has, in effect, asked Commerce to conduct an LTAR analysis; such an analysis is neither required nor appropriate.  As Commerce explained in the Draft Results, the statutory language does not contemplate applying an LTAR analysis to revenue forgone programs (or treating a program as both revenue forgone and the provision of a good/service).

- Commerce also properly addressed issues raised by the CIT and Hyundai Steel, and explained that Commerce was not required to account for the construction costs incurred by Hyundai Steel in its benefit analysis.  Further, Commerce refuted, in detail, the existence of an "excessive benefit" standard and, moreover, noted that application of such a standard would not change Commerce's benefit analysis in this case.

**Commerce's Position:**  We continue to find that the benefit analysis Commerce applied to the port program – supported by the additional explanation provided in these final results of redetermination – is consistent with the Act and CVD regulations, and is supported by

substantial evidence on the record.[112]  Therefore, we continue to find that it is inappropriate to analyze the port usage rights program, as alleged and countervailed in the *Final Results*, in terms of adequacy of remuneration.

In its comments on the Draft Results, Hyundai Steel first argues that Commerce "wrongly characterizes the basis for its port rights program benefit determination" on remand and asserts that Commerce's benefit finding in the *Final Results* was, in fact, *intended* to be based on an LTAR analysis.[113]  This interpretation of the record is plainly incorrect.  In support of its argument, Hyundai Steel notes that a block quote from Commerce's *Final Results* IDM contains language that is related to the provision of goods or services.  The quotation reads:

> {w}e further clarify that the benefit received is further supported by Commerce's regulations at 19 CFR 351.503(b), which states that for other government programs, the Secretary normally will consider a benefit to be conferred where a firm pays less for its inputs (*e.g.*, money, a good, or a service) than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn.  Here, Hyundai Steel was able to collect berthing fees and other fees and was not required to remit those fees to the GOK.  Thus, a benefit was conferred under 19 CFR 351.503(b) under this program.[114]

As explained above, it was the portion of the quote regarding *additional revenue* (*i.e.*, "receives more revenues than it otherwise would earn") that Commerce was emphasizing in the underlying *Final Results*.  Commerce's statement is supported by the fact that, under the program in question, Hyundai Steel was given the right to *collect revenue* that it otherwise would not have earned had such fees been provided to the GOK.  Despite this, Hyundai Steel observes that the quotation also contains language related to adequacy of remuneration and asserts that "{t}he

---

[112] *See* section III.B.1, "Commerce analyzed this program as revenue forgone and not in terms of adequacy of remuneration," *supra*.

[113] *See* Hyundai Steel Comments at 2.

[114] *Id.*; *see also Final Results* IDM at 28.

Court thus sensibly concluded that Commerce's benefit determination was an LTAR one."[115]

This interpretation is unsupported by the record and is a misinterpretation of Commerce's findings, given that Commerce never stated that it was applying an LTAR analysis to the program and never referenced a concomitant benchmark analysis.  In fact, Hyundai Steel itself stated in the underlying review that "{i}t could hardly be said that the provision of port usage rights could fit into any of the enumerated categories listed in section 771(5)(E) {of the Act}."[116] Now, in a change of course, Hyundai Steel argues that section 771(5)(E)(iv) of the Act does apply to the program at issue.

An examination of 19 CFR 351.503 itself also supports such a conclusion.  The regulations, at 19 CFR 351.503(a), reference subsidy programs for which there are "Specific Rules" governing the measurement of a benefit.  For instance, calculation of a benefit for programs relating to the provision of goods or services is covered by 19 CFR 351.511; similarly, grants are covered by a dedicated provision at 19 CFR 351.504.  In contrast, 19 CFR 351.503(b) explicitly relates to "other subsidies," *i.e.*, those not covered by dedicated rules.  Thus, Commerce's citation to 19 CFR 351.503(b) cannot be construed as a reference to the LTAR/MTAR provisions.  Here, due to the unique nature of the program, wherein the GOK granted a private party the right to collect fees (*i.e.*, a situation not explicitly described in the "Specific Rules"), Commerce cited 19 CFR 351.503(b) in support of the proposition that – regardless of the unique nature of the benefit – Commerce appropriately countervailed the program.

Hyundai Steel also argues that no statutory provision links the "prevailing market conditions" and "conditions of purchase or sale" language solely to programs that are found to

---

[115] *See* Hyundai Steel Comments at 4.
[116] *Id.* at 9.

reflect the provision of goods/services for a financial contribution analysis.[117]  Stated differently, Hyundai Steel suggests that Commerce could find a program to be revenue forgone for the purposes of a financial contribution analysis but still subject to the requirements of section 771(5)(E) of the Act regarding adequacy of remuneration.  This interpretation is not supported by the construction of the Act.  Section 771(5)(E)(iv) of the Act, when read together with the subclause below it, states that, "in the case where goods or services are provided," the "adequacy of remuneration shall be determined in relation to prevailing market conditions *for the good or service being provided*."[118]  The immediately preceding sub-section (*i.e.*, section 771(5)(D) of the Act), which addresses financial contribution, identifies "providing goods or services"[119] separately from other types of financial contributions, such as "foregoing or not collecting revenue that is otherwise due."[120]  Thus, the Act separately lists the provision of goods or services as a type of financial contribution and then, in the immediately subsequent provision, separately references the provision of goods or services (twice) in the context of defining certain types of benefits.  Given the clear categorization of subsidy programs in this manner, we disagree with Hyundai Steel's assertion – in clear contradiction to its position in the administrative proceeding – that the adequacy of remuneration language would apply to revenue forgone programs as well as programs relating to the provision of goods or services.

Hyundai Steel does not cite a single case in support of its interpretation.  As explained above, despite the extensive judicial/administrative precedent cited and discussed in the *Final*

---

[117] *Id.* at 3.
[118] *See* section 771(5)(E) of the Act (emphasis added).
[119] *See* section 771(5)(D)(iii) of the Act.
[120] *See* section 771(5)(D)(ii) of the Act.

33

*Results* and related briefing, none of the cases employed an LTAR analysis for a similar port program,[121] and Hyundai Steel did not suggest otherwise in the underlying review.

Here, Commerce countervailed Hyundai Steel's right to collect payments that were otherwise payable to the GOK as revenue forgone, and the calculation did not relate to a "good or service being provided."[122]  This conclusion holds whether considering section 771(5)(D) of the Act for a financial contribution analysis or 771(5)(E) of the Act for a benefit analysis.  The CIT already sustained, and no party challenged, Commerce's conclusion with respect to our financial contribution determination.[123]  With respect to the benefit determination, given that our analysis did not concern a "good or service being provided" under the program in question, references to "prevailing market conditions" and "conditions of purchase or sale" are inapplicable based on the plain language of the Act.[124]

We also disagree with Hyundai Steel's assertion that our discussion of the statutory offset criteria under section 771(6)(A) and the "effect of the subsidy" under section 771(5)(C) of the Act is unnecessary.  With respect to the former, Hyundai Steel asserts that it never requested a statutory offset.  That is correct and, indeed, Hyundai Steel would not qualify for one.  However, this provision also highlights that the Act provides a very narrow set of circumstances under which a benefit may be reduced by a related cost pursuant to section 771(6)(A) of the Act,

---

[121] *See* note 75, and cases cited therein, *supra*.

[122] Moreover, references to the statutory provision in the *CVD Preamble*, in the context of discussing 19 CFR 351.511, make clear that the LTAR language relates to price comparability when applying a benchmark for comparison.  *See CVD Preamble*, 63 FR at 65377.  We did not rely on a benchmark here, as doing so was unnecessary under a revenue forgone analysis.

[123] *See Remand Order* at 6.

[124] Hyundai Steel also asserts that the legal principles of *GOSL* support an analysis of the costs associated with constructing the port in determining whether the right to fees represents a countervailable benefit.  However, as explained in the underlying review and in these final results of redetermination, the port program is distinct from the program under consideration in that case, because "{t}he GOK did not require Hyundai Steel to build a port at a certain cost, nor did the GOK require Hyundai Steel to build a port in order to benefit other recipients"; rather, "Hyundai Steel benefitted from building the port" and, in fact, is the only party to have used the port to date.  *See Final Results* IDM at 23; *see also* Commerce's discussion of section 771(5)(C) of the Act, *infra*.

*i.e.*, where the cost in question is an "application fee, deposit, or *similar payment* paid in order to qualify" for a program. The costs associated with port construction cannot be considered "similar to" an applicable fee. Accordingly, Commerce noted this in the context of its discussion regarding the provision enumerating allowable offsets to demonstrate that Hyundai's costs of construction are not relevant to our benefit analysis.

With respect to our discussion of section 771(5)(C) of the Act, Hyundai Steel asserts that the provision – and the corresponding examples in the *CVD Preamble* – are inapposite.[125] The provision states that Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists," and the two cited examples stand for the proposition that a government action causing the imposition of a cost should be considered separate from a benefit that offsets that cost. Here, Hyundai Steel and the GOK entered an agreement under which Hyundai Steel would construct a port, and the GOK provided various benefits to Hyundai Steel as a result, regardless of the costs incurred. Hyundai Steel asserts that the examples contained in the *CVD Preamble* – instances where the government required companies to purchase equipment, but then provided subsidies for the equipment – are different from Hyundai Steel's scenario because, there, the hypothetical company owned the equipment as an asset.

We do not find that the alleged distinction is meaningful for purposes of this remand redetermination. First, as noted throughout these final results of redetermination, Hyundai Steel was given the right to operate the port for an extended period of time that amounted to constructive ownership, and it is the only party that has used the port to date. The fact that ownership of the port legally reverts to the GOK is more form over substance and is not a meaningful difference from the cited examples. Second, in the two examples in the *CVD*

---

[125] *See* Hyundai Steel Case Brief at 10.

*Preamble* discussed above, the government *required* that a company incur a cost; nonetheless, that cost does not constitute a consideration that undermines or offsets the subsidy benefit. Here, the GOK did not require that Hyundai Steel build a port – Hyundai Steel elected to do so, plainly for its own benefit. Thus, there is no justification as to why the principle laid out in section 771(5)(C) of the Act and the *CVD Preamble* is not applicable; rather, the underlying principle is particularly relevant here.

Hyundai also claims in its arguments that the CAFC precedent, *AK Steel Corp.*, is not controlling because the case was decided under pre-URAA law, and in *AK Steel Corp.*, the respondent was arguably given ownership-type rights via free usage, whereas here Hyundai Steel was given the right to collect certain fees from third party users of the port as reimbursement.[126] Although the *AK Steel Corp.* decision involved pre-URAA law, the Act, as amended, does not mandate a different conclusion. Hyundai Steel argues that "'benefit conferred,'… prior to the URAA had not been a statutory requirement."[127] However, Hyundai Steel's position ignores the analysis conducted by the CAFC in *AK Steel Corp.* that "Commerce must determine whether a governmental program *provided a benefit* to a specific industry."[128] Thus, while the language in section 771(5)(E) may not have existed in the Act at the time, the requirement that Commerce determine whether a subsidy program provided a benefit did exist at that time.[129]

Regarding Hyundai Steel's second argument, that the *AK Steel Corp.* respondent was arguably given ownership-type rights, as we have explained, Commerce also determined that in this case Hyundai Steel was given the right to operate the port for an extended period of time that

---

[126] Hyundai Steel Remand Comments at 12.
[127] *Id.*
[128] *See AK Steel Corp.*, 192 F. Supp. at 1372 (emphasis added).
[129] *Id.*, 192 F. Supp. at 1382 (holding "that { } POSCO's exemption from dockyard user fees *constituted a countervailable benefit* are supported by substantial evidence.") (emphasis added).

Barcode:4363743-01 C-580-884 REM - Remand  -  Slip Op. 23-15

amounted to constructive ownership, and it is the only party that has used the port to date.  Thus, there is no realistic distinction between the rights provided to the respondent in *AK Steel Corp.* and the rights provided to Hyundai Steel in this case.

Next, Hyundai Steel asserts that Commerce's prior decisions appropriately consider whether the GOK's reimbursement for port construction is excessive, and it contends that "this is a logical way to view these programs because if the port rights granted to the respondent do not exceed the costs incurred to build the port then there is no basis to determine that the respondent has received a countervailable benefit."[130]  Hyundai Steel also claims that the excessive duration of the rights period was considered in the context of Commerce's benefit analysis in *CR from Korea 2000* and *CORE from Korea 2011*.  As explained at length above, the duration of the rights period is related to our specificity determination, and not our benefit determination.  In *CR from Korea 2000*, Commerce stated that the benefit was the "full amount of the yearly exemption" and did not indicate that the benefit would be a pro-rated amount to reflect a purportedly excessive portion of benefit.[131]  Similarly, in *CORE from Korea 2011*, Commerce stated that the program provided a benefit "in the amount of the port charges that were not collected."[132]  In neither instance did Commerce state that the benefit was somehow negated, adjusted, or otherwise offset to account for only the purportedly excessive portion of a benefit.

Finally, we continue to find, even assuming *arguendo* that Hyundai Steel's proposed standard is correct, that applying that very standard still results in a finding that the program is countervailable, because the duration of the rights provided to Hyundai Steel exceed the

---

[130] *See* Hyundai Steel Case Brief at 11.
[131] *See CR from Korea 2000* IDM at Comment 11 ("As noted earlier, the benefit is the full amount of the yearly exemption provided to Dongbu under this program.").
[132] *See CORE from Korea 2011 Preliminary* PDM at 11 ("Further, we preliminarily determine that the exemptions confer a benefit under section 771(5)(E) of the Act in the amount of the port charges that were not collected."), unchanged in *CORE from Korea 2011 Final.*

Filed By: Kelsie Hohenberger, Filed Date: 4/10/23 11:44 AM, Submission Status: Approved

applicable AUL period.  Hyundai Steel notes that the various AULs listed in its financial

statements range from 14 to 50 years, and, thus, that it is not clear that the 41 year and eight

month usage period provided for the port strictly exceeds the AUL period.  Hyundai Steel never

discusses the IRS Class life document placed on the record of this remand, which also shows that

the nearly 42-year period granted to Hyundai Steel substantially exceeds the useful life of the

underlying assets.  In apparent recognition of this, Hyundai Steel backtracks on its arguments,

now stating that "the AUL period is just one barometer used by Commerce to determine whether

the provision of rights by the GOK constituted effective ownership and, thus, an excessive

benefit."[133]  This constitutes another reversal from Hyundai Steel's position in the underlying

proceeding, where it argued in favor of relying on useful life periods to conduct the "excessive

benefit" analysis.  In discussing *CR from Korea 2000* and *CTL Plate from Korea 2005*, Hyundai

Steel argued that:

> {c}entral to this determination was that {Commerce} found that Dongbu received
> more than just a limited exemption on its harbor fee{,} *{i}t also received*
> *compensation which lasted longer than the useful life in of {sic} the constructed*
> *assets.*
>
> …
>
> *{F}or most industries and most types of industries, the IRS tables have provided*
> *an accurate and fair approximation of the AUL of assets in the industry in*
> *question*.  Thus, {Commerce} determined that {Dongkuk Steel Mill Co., Ltd.'s*
> (DSM)} 50-year free use period constitutes a period of time so great that the
> GOK's *compensation outlasts the useful life of the constructed assets and*
> *effectively renders ownership of the facility to DSM.*[134]

In short, Hyundai Steel previously favored relying on the applicable AUL period when it

understood the period to be in excess of the GOK-Hyundai Steel port agreement duration.  Now,

---

[133] *See* Hyundai Steel Case Brief at 14.
[134] *Id.* at 5-6 (internal citations and quotations omitted).

Barcode:4363743-01 C-580-884 REM - Remand  -  Slip Op. 23-15

with the applicable class life table placed on the record, Hyundai Steel downplays the relevance of the standard it previously proposed and supported.

For the reasons discussed, we continue to disagree that Commerce has, or should, apply a so-called excessive benefit standard to determine whether port rights are countervailable. However, even if we did so here, Hyundai Steel's arguments on this matter would not change our conclusion with respect to this program.

## V.    FINAL RESULTS OF REDETERMINATION

For these final results of redetermination, we find that the Reduction for Sewerage Fees program is not countervailable and we have provided additional explanation as to why the Provision of Port Usage Rights at the Port of Incheon program confers a benefit.  As a result of the modifications made in these final results of redetermination, we find that Hyundai Steel's overall subsidy rate for the POR is 0.50 percent.

4/7/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

Filed By: Kelsie Hohenberger, Filed Date: 4/10/23 11:44 AM, Submission Status: Approved

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1100

**Short Case Caption:** Hyundai Steel Company v. United States

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __6351__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __12/29/2023__

Signature: __/s/ Brady W. Mills__

Name: __Brady W. Mills__

Save for Filing

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF SERVICE</u>

**Case Number** 24-1100

**Short Case Caption** Hyundai Steel Company v. United States

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 12/29/2023

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Sosun Bae | sosun.bae@usdoj.gov |
| Hendricks Valenzuela | hendricks.valenzuela@trade.gov |
| | |
| | |
| | |

☐ Additional pages attached.

Date: 12/29/2023

Signature: /s Brady W. Mills

Name: Brady Mills

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 24-1100

**Short Case Caption:** Hyundai Steel Company v. United States

> **Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:
>
> - Only count each unique word or number once (repeated uses of the same word do not count more than once).
>
> - For a responsive filing, do not count words marked confidential for the first time in the preceding filing.
>
> The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains _____14_____ number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 12/29/2023

Signature: /s/ Brady W. Mills

Name: Brady W. Mills