24-1100

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

HYUNDAI STEEL COMPANY,
Plaintiff-Appellant,

v.

UNITED STATES,
Defendant-Appellee,

---

On Appeal From The United States Court Of International Trade
Court No. 21-00536, Honorable Jennifer Choe-Groves, Judge

---

BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES

---

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
HENDRICKS VALENZUELA
Attorney
Office of the Chief Counsel for
Trade Enforcement & Compliance
Department of Commerce
Washington, D.C. 20230

CHRISTOPHER A. BERRIDGE
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-0537
Christopher.Berridge@usdoj.gov

*Attorneys for Defendant-Appellee*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF RELATED CASES ......................................................... v

STATEMENT OF THE ISSUE .................................................................. 1

STATEMENT OF THE CASE ................................................................... 1

I.     Nature Of The Case .................................................................... 1

II.    The Countervailing Duty Statute ................................................ 2

III.   The Administrative Determination ............................................. 4

IV.    Court Proceedings And Remand Redetermination ..................... 8

SUMMARY OF THE ARGUMENT ........................................................ 11

ARGUMENT ........................................................................................ 12

I.     Standard Of Review ................................................................. 12

II.    Commerce's Determination That The Port Of Incheon Program Provides
       A Countervailable Benefit Is Lawful And Supported By
       Substantial Evidence ............................................................... 13

       A. Hyundai Steel Was Conferred A Benefit Regardless Of Any
          Construction Costs Incurred In Building The Port ................. 14

       B. Hyundai Steel's Reliance On Other Court Of International Trade
          Opinions Is Misplaced ........................................................ 22

CONCLUSION ..................................................................................... 27

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)...................................................*passim*

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ......................................................................13

*Fine Furniture (Shanghai) Ltd. v. United States*,
    748 F.3d 1365 (Fed. Cir. 2014).................................................2, 12

*Government of Sri Lanka v. United States*,
    308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) .........................24, 25, 26

*Hyundai Steel Co. v. United States*,
    615 F. Supp. 3d 1351 (Ct. Int'l Trade 2023) ...................................... 2

*Hyundai Steel Co. v. United States*,
    651 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) ...............................*passim*

*Hyundai Steel v. United States*,
    658 F. Supp. 3d 1331 (Ct. Int'l Trade 2023) ...............................22, 23

*Hyundai Steel v. United States*,
    659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) ....................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .............................................................................19

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)..........................................................13

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)..........................................................13

*SKF USA Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011)..........................................................19

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011) ................................................................. 12, 13

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................... 12

19 U.S.C. § 1671(a) .................................................................................. 2

19 U.S.C. § 1677(5)(C) ........................................................................ 3, 10, 21

19 U.S.C. § 1677(5)(D) ........................................................................... 13

19 U.S.C. § 1677(5)(D)(ii) .............................................................. 4, 6, 8, 13

19 U.S.C. § 1677(5)(D)(iii) ...................................................................... 3

19 U.S.C. § 1677(5)(D)(iv) ....................................................................... 3

19 U.S.C. § 1677(5)(E) ..................................................................... *passim*

19 U.S.C. § 1677(5)(E)(iv) ....................................................................... 9

19 U.S.C. § 1677(5A)(D)(iii) .............................................................. 13, 19

19 U.S.C. § 1677(6) .......................................................................... 10, 21

## Regulations

19 C.F.R. § 351.503(b) ............................................................................ 8

19 C.F.R. § 351.503(c) ...................................................................... 3, 10, 21

19 C.F.R. § 351.511 .............................................................................. 4

## Other Authorities

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary
  Results of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg.
  10,533 (Dep't of Commerce Feb. 22, 2021) ................................................ *passim*

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 47,621 (Dep't of Commerce Aug. 26, 2021) ....................................................................*passim*

*Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 Fed. Reg. 37,338, 37,347-348 (Dep't of Commerce July 9, 1993)............................15

*Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From the Republic of Korea*, 67 Fed. Reg. 62,102 (Dep't of Commerce Oct. 3, 2002) ............................................................19, 20

Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act, H.R. Doc. 103-316, Vol. 1 (1994)...................................2, 3, 18

*CVD Preamble*, 63 Fed. Reg. 65,361 (Nov. 25, 1998) ......................................3, 23

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5(a)(1), defendant-appellee, the United States is not aware of any appeal in or from the same civil action that has previously been before this Court or in another appellate court.  Pursuant to Federal Circuit Rule 47.5(a)(2), defendant-appellee believes a decision in this case will affect *Hyundai Steel Co. v. United States*, CIT Court No. 21-00304.

## STATEMENT OF THE ISSUE

Whether the Department of Commerce's determination that the Provision of Port Usage Rights at the Port of Incheon Program (the port program) provides a countervailable benefit is lawful and supported by substantial evidence.

## STATEMENT OF THE CASE

### I.    Nature Of The Case

This appeal concerns the final judgment of the United States Court of International Trade (CIT) in *Hyundai Steel Co. v. United States*, 651 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) (*Hyundai Steel II*), sustaining Commerce's determination that the provision of port usage rights by the government of Korea conferred a countervailable benefit to Hyundai Steel during the 2018 administrative review of the countervailing duty order covering certain hot-rolled steel from Korea.  *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 47,621 (Dep't of Commerce Aug. 26, 2021) (final results), Appx16511-16512, Appx16483-16510.  Specifically, plaintiff-appellant Hyundai Steel asserts the CIT's decision to sustain Commerce's benefit determination with respect to the

port program was not supported by substantial evidence and not in accordance with law.

## II.    The Countervailing Duty Statute

The countervailing duty statute, 19 U.S.C. § 1671(a), is a "remedial measure that provides relief to domestic manufacturers by imposing duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014).  "The statute mandates that if 'the government of a country or any public entity within the territory of a country' is providing a countervailable subsidy with respect to the production or exportation of specific merchandise, 'then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy.'" *Id.* (quoting 19 U.S.C. §1671(a)).

Further, 19 U.S.C. § 1677(5)(E) "provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy." Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act (URAA), H.R. Doc. 103-316, Vol. 1 (1994), at 927 (SAA).  A benefit is conferred when the recipient has received the benefit. *See* 19 U.S.C. § 1677(5)(E).  Commerce examines whether a benefit has been conferred "without regard to whether the subsidy is provided directly or indirectly on the manufacture,

production, or export of merchandise," and "is not required to consider the effect

of the subsidy in determining whether a subsidy exists." 19 U.S.C. § 1677(5)(C).

The SAA accompanying the URAA explains that the CVD statute "does not

require that Commerce consider or analyze the effect (including whether there is

any effect at all) of a government action on the price or output of the class or kind

of merchandise under investigation." SAA at 926. Commerce's regulations echo

this analytical approach. *See* 19 C.F.R. § 351.503(c); *CVD Preamble*, 63 Fed. Reg.

at 65,361 ("a determination of whether a firm's costs have been reduced or

revenues have been enhanced bears no relation to the effect of those cost

reductions or revenue enhancements on the firm's subsequent performance, such as

its prices or output").

　　When reviewing a benefit conferred through a subsidy pursuant to 19

U.S.C. § 1677(5)(E), Commerce will often conduct a "less than adequate

renumeration" (LTAR) analysis. Commerce conducts an LTAR analysis, for

example, when there are goods or services provided to the beneficiary for less than

adequate renumeration as set forth in 19 U.S.C. § 1677(5)(D)(iii), or if goods or

services are being purchased, whether the purchase price is for more than adequate

renumeration as established in 19 U.S.C. § 1677(5)(D)(iv). 19 U.S.C. §

1677(5)(E). An LTAR analysis involves Commerce comparing a benchmark price

for a good or service usually determined by the market and then comparing that

market price to the good or service being provided or purchased as a subsidy. After making a comparison between the prices and considering the market conditions, Commerce is able to determine the amount of the benefit conferred. *Id.*; *see also* 19 C.F.R. § 351.511.

Depending on the facts of some cases, like this case, Commerce will analyze a benefit conferred under a "revenue forgone" analysis. Where a benefit conferred is not the provision or purchase of a good for less (or more) than adequate renumeration, but rather, the provision of financial contributions in the form of forgone revenue streams as set forth in 19 U.S.C. § 1677(5)(D)(ii), Commerce conducts a revenue forgone analysis instead of a LTAR analysis. This is because there is no comparison necessary between a less than renumeration good and a market-value good; the benefit is simply the amount of the fees that would have been paid to the government but for the benefit conferred.

## III.    The Administrative Determination

On December 11, 2019, Commerce initiated an administrative review of the countervailing duty order covering hot-rolled steel from Korea for the period of January 1, 2018 through December 31, 2018. Appx00162-00168. Following comments by interested parties, Commerce selected Hyundai Steel as the sole mandatory respondent in this administrative review. *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Countervailing*

4

*Duty Administrative Review, 2018*, 86 Fed. Reg. 10,533 (Dep't of Commerce Feb. 22, 2021) (preliminary results), Appx15639-15641, Appx15573-15592.

During the review, Hyundai Steel and the government of Korea responded to several questionnaires issued by Commerce. *See* Appx15574-15575 (citing questionnaire responses between March and April 2020, and July 2020 through January 2021, Appx00749-03207; Appx03754-06271; Appx08835-10387; Appx10443-12858; Appx13029-13274; Appx13275-13413). Relevant here, the government of Korea described the port program as part of a public-private partnership wherein the government of Korea entered into an arrangement to construct a wharf at the North Port of Incheon by attracting investment from the private sector instead of using its own budget. Appx15588. Hyundai Steel reported it entered into an agreement with the Ministry of Oceans and Fisheries regarding the construction of the wharf at North Incheon Harbor in August 2001 and entered into a revised agreement in April 2009. Appx15589.

Under the agreement, Hyundai Steel financed the construction of the Incheon Wharf and, pursuant to Korean law, ownership of the port facility reverted to the government of Korea in 2007, when construction of the wharf ended. *Id.* In exchange, Hyundai Steel received money from the government of Korea between 2004 and 2007 for certain construction costs, and the remaining construction costs were being amortized by Hyundai Steel over a specified period. *Id.* Hyundai Steel

was granted a free use period of the port, bestowed the right to operate and use the port for its own operations, and given the right to collect fees from third-party users. *Id.*

Hyundai Steel reported that it collected berth occupancy charges (or berthing income) from shipping companies and reported these amounts for each of the years from 2007 through 2018. *Id.* Additionally, Hyundai Steel reported that, in connection with its own usage of the port, it had a service contract with an unaffiliated private terminal operating company. *Id.* Hyundai Steel explained that harbor facility usage fees can be levied as harbor facility lease fees for terminal operating companies, as prescribed in Article 2(6) of the Korean Harbor Transport Business Act. *Id.* Therefore, Hyundai Steel was entitled to collect harbor facility usage fees from the terminal operating company. *Id.* The specific harbor facility usage fees relating to the terminal operating company during the period of review that Hyundai Steel reported amounts for are apron usage fees, land usage fees, and open storage yard fees. *Id.*

In its preliminary results, Commerce preliminarily determined that, pursuant to 19 U.S.C. § 1677(5)(D)(ii), the port program provided a specific financial contribution to Hyundai Steel because it gave Hyundai Steel the right to collect fees that would have otherwise been collected by the government of Korea. Appx15590. Commerce determined that the benefit existed in the amount of the

6

fees that Hyundai Steel was entitled to collect under the operating agreement with the government of Korea and Commerce further calculated a countervailable subsidy rate of 0.01 percent *ad valorem* for Hyundai Steel under the port program. *Id*. Commerce calculated a preliminary overall net subsidy rate for Hyundai Steel of 0.51 percent. Appx15640.

In the administrative case and rebuttal briefs, parties raised arguments regarding the port program. Hyundai Steel argued that the Korean government's provision of port usage rights does not provide a countervailable benefit because the usage rights represent a repayment of a debt for construction costs and were not excessive. Appx16499-16500. Hyundai Steel claimed that repayments of debts by providing port usage rights were not the same as a subsidy like a grant or a loan, and thus were not countervailable. *Id.* But even if the provision of the port usage rights was a financial contribution, Hyundai Steel argued that the financial contribution did not result in a net financial benefit to Hyundai Steel when factoring in the construction costs. *Id.*

In the final results, Commerce continued to find that the port program was countervailable, as "the essence of the [port] program is that the [government of Korea] helped Hyundai Steel build a port of its own use for an extended period of time" and the benefit was provided through reimbursements and "forgoing revenue…such as berthing fees and other user fees." Appx16499-16505.

Commerce found that, although this specific subsidy did not fit neatly into the non-exhaustive list of benefits conferred in 19 U.S.C. § 1677(5)(E), the port program nevertheless qualified as a benefit conferred under 19 U.S.C. § 1677(5)(D)(ii) and further described in 19 C.F.R. § 351.503(b): "where a firm…receives more revenues than it otherwise would earn."  Appx16503.

As no other party used the port during the period of review, Commerce analogized the port program to a situation in which a company receives assistance for building a port for its own use.  Appx16502.  As additional support for its conclusion, Commerce relied upon *AK Steel Corp. v. United States*, 192 F.3d 1367, 1379 (Fed. Cir. 1999).  In that case, this Court sustained Commerce's rejection of similar arguments that the exemptions granted by the government of Korea to steel manufacturer POSCO were a form of reimbursement for building and paying for the port berths that POSCO was required to cede back to the government of Korea. *Id.*  As such, Commerce calculated a final subsidy rate for Hyundai Steel of 0.51 percent. *See Final Results*, 86 Fed. Reg. at 47,622, Appx16512.

### IV.    Court Proceedings and Remand Redetermination

Following Commerce's issuance of the final results, Hyundai Steel filed suit at the CIT challenging Commerce's determinations regarding the countervailability of the reduction for sewerage fees program, an unrelated issue not subject to this appeal, and the countervailability of the port program.  Commerce requested

8

voluntary remand with respect to the sewerage fees program and defended its

determination to find the port program to be a countervailable benefit.

On remand, the trial court granted the request for remand on the sewerage fees program,

but further remanded Commerce's benefit determination for the port program to

consider information "regarding adequate remuneration for port usage in relation

to the prevailing market conditions, such as 'price, quality, availability,

marketability, transportation, and *other conditions of purchase or sale*.'" *Hyundai

Steel Co. v. United States*, 615 F. Supp. 3d 1351 (Ct. Int'l Trade 2023) (*Hyundai

Steel I*) (emphasis in original), Appx00010.  The trial court reasoned that, although

Commerce considered a variety of information in determining whether a benefit

was conferred, Commerce did not consider prevailing market conditions as is

required by 19 U.S.C. § 1677(5)(E), (E)(iv) when Commerce determined adequacy

of renumeration.  Appx00009-00010.

On remand, Commerce provided further explanation for its benefit

determination regarding the port program including why Commerce was not in fact

performing an LTAR analysis such that prevailing market conditions would need

to be considered and was instead analyzing the port program as conferring a

benefit in the form of revenue forgone.  Appx16749-16787.  Commerce placed

information on the record and provided additional explanation as to why the port

program conferred a benefit in the form of revenue foregone.  Appx16759-16775,

9

Appx16778-16787.  Commerce explained that the statute and regulations support its determination that the analysis regarding adequacy of remuneration did not apply to Commerce's revenue forgone analysis, which it applied when countervailing the port program.  Appx16760-16767.

Additionally, Commerce explained that it was not required to consider the costs incurred by Hyundai Steel in constructing the port for purposes of its subsidy analysis under 19 U.S.C. § 1677(5), (6), and 19 C.F.R. § 351.503(c).  Commerce found that none of these statutes or regulations that allowed for adjustments to determine a net countervailable subsidy applied to the port program.  Commerce found that, in fact, 19 U.S.C. § 1677(5)(C) specifically allows for Commerce to disregard the effect of the subsidy, including whether incurred construction costs were repaid in full or in part by a subsidy like the port program.  Appx16768-16770.  Commerce also concluded that it has no "excessive benefit" practice that could lead to a different conclusion as to whether a benefit was indeed conferred to Hyundai Steel in this case.  Appx16771-16775.

Commerce continued to find that the port program conferred a benefit to Hyundai Steel in the amount of 0.01 percent during the period of review.  Appx16775.  However, because of the changes made on remand to the sewerage fees program, Commerce calculated an overall net subsidy rate for the period of review just above *de minimis*, at 0.50 percent.  Appx16787.

10

The trial court sustained Commerce's remand redetermination. Appx00014-00027. The trial court held that Commerce reasonably determined that a "revenue forgone analysis was more appropriate than a LTAR analysis" as Hyundai Steel's non-payment of port usage fees "did not involve the provision of goods or services, but rather involved a type of financial contribution from revenue forgone when the Government of Korea conferred the right to Hyundai Steel to collect revenue from third parties at the port." Appx00022. The trial court also concluded that "Commerce reasonably determined that the Government of Korea's provision of rights under the Port of Incheon Program, specifically the right to collect revenues from third parties using the port, conferred a benefit to Hyundai Steel." *Id.* Accordingly, the trial court sustained the remand redetermination with respect to the port program and entered judgment in favor of the United States. This appeal followed.

## SUMMARY OF THE ARGUMENT

Commerce's determination that the port program conferred a benefit to Hyundai Steel during the period of review was in accordance with law and supported by substantial evidence. The record shows that the government of Korea gave Hyundai Steel the right to collect fees that the government of Korea would have collected but for the port program.

Although Hyundai Steel contends that the right to collect fees and its constructive ownership of the port was simply a repayment for constructing the port, Commerce was not required to consider construction costs when determining whether a benefit was ultimately conferred upon Hyundai Steel by the government of Korea. On the contrary, precedent from this Court supports Commerce's methodology in reaching its determination, and thus the trial court's judgment should be affirmed.

## **ARGUMENT**

### I.    **Standard Of Review**

This Court "review[s] decisions of the Court of International Trade evaluating Commerce's final determinations by reapplying the standard that the Court of International Trade applied in reviewing the administrative record." *Fine Furniture (Shanghai)*, 748 F.3d at 1369 (citation omitted). Accordingly, this Court sustains any determination, finding, or conclusion made by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).

The Court must affirm the agency's determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusion. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006). Even if it is possible to draw two inconsistent conclusions from the evidence contained in the record, this does not mean that Commerce's findings are not supported by substantial evidence. *Id.*; *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).

## II. Commerce's Determination That The Port Of Incheon Program Provides A Countervailable Benefit Is Lawful And Supported By Substantial Evidence

The trial court's judgment, sustaining Commerce's countervailing of the port program, should be affirmed. Commerce determined that the program provided a financial contribution for purposes of 19 U.S.C. § 1677(5)(D) because the fees that the government of Korea gave Hyundai Steel the right to collect – berthing income and harbor facility usage fees – would otherwise have been collected by the government of Korea, absent the agreements between the parties. Thus, the fees represented revenue forgone by the government of Korea within the meaning of 19 U.S.C. § 1677(5)(D)(ii). Commerce also determined the program is specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I) because "the actual recipients … are limited in number." Appx16774. Further, Commerce determined that a benefit exists under 19 U.S.C. § 1677(5)(E) in the amount of the fees that Hyundai Steel

13

was entitled to collect under the operating agreement with the government of Korea. *See* Appx15589-15590; Appx16499.

Hyundai Steel does not challenge Commerce's finding regarding financial contribution or specificity. Instead, Hyundai Steel argues that Commerce's determination that the Korean government's provision of port usage rights provide a countervailable benefit is not in accordance with law because the rights were provided by the government of Korea as a repayment of a debt. Hyundai Steel further contends that Commerce ignored its "practice where it has found that the provision of port usage rights in Korea may be countervailable if the resulting benefit was 'excessive.'" Hyundai Steel Br. at 10-11. However, as sustained by the trial court, Commerce's determination that the port program provides a countervailable benefit is supported by substantial evidence and in accordance with law.

### A. Hyundai Steel Was Conferred A Benefit Regardless Of Any Construction Costs Incurred In Building The Port

In determining whether the right to collect port usage fees constitute a countervailable benefit, and in considering Hyundai Steel's argument that the non-payment of port usage fees is consideration for the cost of construction of the port, Commerce found that the rationale set forth in *AK Steel* was "directly applicable." Appx16502. Commerce's approach is consistent with this Court's decision in *AK*

14

*Steel*, which found that construction costs did not need to be factored in when considering whether a subsidy was countervailable. *AK Steel*, 192 F.3d at 1382.

In *AK Steel*, this Court sustained Commerce's determination to countervail POSCO's exemption from dockyard fees, or user fees, which the government of Korea would normally charge for the use of berths in the Kwangyang Bay Industrial Estate (KBIE) port facility. *Id.* That program also gave POSCO the right to collect fees up to the amount of the investment, and as reported by POSCO and the government of Korea, POSCO was the only company located in the KBIE that did not pay dockyard fees for the use of the berths. *See Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 Fed. Reg. 37,338, 37,347-348 (Dep't of Commerce July 9, 1993). This Court found that that POSCO's right to collect fees and exemption form dockyard and user fees were still countervailable subsidies even though POSCO incurred construction costs instead of the Korean government. *AK Steel*, 192 F.3d at 1382.

The record of this case similarly demonstrates that the government of Korea did not collect the fees that it was entitled to collect, but instead awarded Hyundai Steel the port usage rights and the right to collect usage fees from third parties following construction of the port. Appx16501-16504; *see also* Appx13043-13045. Both this matter and *AK Steel* concern programs in which private

15

companies incurred the costs of building infrastructure which upon completion they had to cede back to the government of Korea.  In return, the government of Korea awarded these companies use of the infrastructure they built for an extended period of time by forgoing fees which the Korean government would otherwise have the right to collect, as well as providing a private party the right to collect fees.

As with the present case, Commerce in *AK Steel* determined that a countervailable benefit was conferred by the exemption from fees and the right to collect usage fees regardless of whether the port was built by the government of Korea or the respondent company.  *AK Steel*, 192 F.3d at 1379;  Appx16502; *see also Steel Products from Korea*, 58 Fed. Reg. at 37,348.  This Court sustained Commerce's finding that the exemptions granted by the government of Korea were not simply a form of reimbursement for building and paying for the port berths that were eventually ceded back to the government of Korea.  This Court recognized that "that if the Korean government had built the port berths, instead of having them ceded by POSCO, Commerce would have 'countervailed the construction funding as a specific infrastructure benefit…'"  *AK Steel Corp.*, 192 F.3d at 1382; *see also Steel Products from Korea*, 58 Fed. Reg. at 37,348.

Commerce determined that the rationale set forth in *AK Steel* was "directly applicable" when it rejected Hyundai Steel's argument that the non-payment of

16

port usage fees is repayment for the cost of construction of the port. Appx16502.

On remand, Commerce reasonably concluded, and the trial court sustained, that

neither the statute nor the regulations required Commerce to consider the costs

incurred by Hyundai Steel in constructing the port for purposes of conducting its

benefit analysis. Appx16767-16771; Appx00018-00023. Commerce continued to

rely on the rationale set forth in *AK Steel* to reject Hyundai Steel's assertion that

the exemption of port fees and the concomitant right to collect usage fees was

merely a reimbursement or repayment by the government of Korea for costs

incurred in building the port. Appx16773.

Hyundai Steel does not argue that the program at issue in *AK Steel* is

distinguishable or functions differently that the port program in this case. Rather,

it argues that "changes in both the law and Commerce's practice render *AK Steel*

inapposite to the port usage rights program at issue in this case." Hyundai Steel

Br. at 21. Specifically, Hyundai Steel argues that the URAA's addition of

subsection (E) to 19 U.S.C. § 1677(5) defined what constitutes a benefit conferred,

and because subsection (E) was not in place for the *AK Steel* determination, the

case is not controlling precedent. Hyundai Steel Br. at 22. Additionally, Hyundai

Steel argues that because Commerce's CVD regulations did not exist at the time,

"*AK Steel* did not address whether the exemption of dockyard fees met the

regulatory definition of 'benefit.'" Hyundai Steel Br. at 22. Hyundai Steel's
arguments are unpersuasive.

The current statutory definition of "benefit conferred" under 19 U.S.C. §
1677(5)(E) merely "reflects the 'benefit-to-the-recipient' standard which long has
been a fundamental basis for identifying and measuring subsidies under U.S. CVD
practice…." SAA at 927. Commerce's obligation to determine whether a benefit
has been conferred remains as it was prior to the URAA-era amendments to the
statute and regulations and, thus, the rationale of *AK Steel* remains good law.

Although the administrative determination in the *AK Steel* decision predates
the URAA-era amendments to Commerce's statute and regulations, neither the
statute, as amended, nor the regulations, mandate a different conclusion. As this
Court observed in *AK Steel*, "Commerce must determine whether a governmental
program *provided a benefit* to a specific industry." 192 F.3d at 1372 (emphasis
added). This is still the case. Accordingly, while the definition of "benefit
conferred" was not codified at the time of *AK Steel*, the statutory requirement that
Commerce determine whether a subsidy program provided a benefit did exist.
Appx16784.

Next, Hyundai Steel argues that Commerce ignored post-URAA agency
practice which applied an "excessive" benefit standard to determine whether a
beneficiary had been overcompensating for costs incurred. Hyundai Steel Br. at

18

23-26.  However, Commerce does not have a practice of considering whether a benefit is excessive in determining whether a benefit has been conferred.  But even if it had deviated from past practice, Commerce is always free to modify its approach to a certain set of facts so long as it provides a reasoned explanation for such a change.  *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)).  Still, Hyundai Steel's argument is based on a misreading of past determinations.

Commerce's consideration of the duration of the rights period in the past determinations cited by Hyundai Steel was in the context of its specificity analysis. Therefore, there has been no change in agency practice with respect to consideration of *whether* a benefit has been conferred.  In *CR from Korea 2000*, Commerce explained that it had previously found that the Korean Harbor Act was not "specific" within the meaning of 19 U.S.C. § 1677(5A)(D)(iii), as the potential beneficiaries were not limited in number; rather, the subsidy was available to a large range of industries.  *Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From the Republic of Korea*, 67 Fed. Reg. 62,102 (Dep't of Commerce Oct. 3, 2002), and accompanying Issues and Decision Memorandum at Comment 11.  Commerce revisited the previous finding about the specificity of the Korean Harbor Act, in the context of the excessive

19

exemption period provided to steel manufacturer Dongbu Steel Company (Dongbu). *Id.* In doing so, Commerce found that the government of Korea was providing a financial contribution in the form of revenue forgone for an extended time period, up to 70 years, in a manner which was *specific* to Dongbu. *Id.* Separately, Commerce determined that the benefit was the *full amount* of the yearly exemption provided to Dongbu under the program and did not indicate that the benefit would be a pro-rated amount to reflect an excessive portion of benefit. *Id.*; Appx16785.

Further, substantial evidence demonstrates that Hyundai Steel built the port for its own commercial benefit, not for a public good or any governmental functions, and that it has the right to use the port for *its own use* for an extended period of time. Appx16502; *see also* Hyundai Steel Br. at 5 (admitting that "no third parties used the port during the 2018 POR…"). Commerce lawfully found the program to be specific because the actual recipients were limited in number to one recipient, *i.e.*, Hyundai Steel.

Additionally, as Commerce explained, application of an "excessive benefit" standard is not required by the statute or the CVD regulations regarding benefits conferred by a government provided financial contribution. Appx16772. Once Commerce determines that a benefit exists, Commerce is not required to assess the costs or modified business practices that resulted from the provision of the subsidy,

*i.e.*, it is not required to consider the effect of the subsidy.  Appx16772-16773; *see also* 19 U.S.C. § 1677(5)(C) and 19 C.F.R. § 351.503(c).

Hyundai Steel contends that it is "not arguing that Commerce must consider the effects of the program."  Hyundai Steel Br. at 25.  Rather, it contends that Commerce failed to analyze whether, given the costs to construct the port, Hyundai Steel in fact received a net "profit" as a result of the program.  *Id.* at 25-26.  But as explained above, the construction costs incurred by Hyundai Steel relative to the subsidy from the government of Korea could not be considered by Commerce under 19 U.S.C. § 1677(6).  *See* Appx16768-16769.  Commerce needed only determine that a benefit existed, not that such benefit was "excessive."  Commerce was also not required to weigh the relative costs and benefits to ascertain whether there was ultimately a net profit for Hyundai Steel.  Accordingly, this Court should sustain Commerce's benefit determination regarding the port program as lawful.

## B. Hyundai Steel's Reliance On Other Court Of International Trade Opinions Is Misplaced

In support of its argument that the port usage rights it received are a repayment of a debt and not a countervailable benefit, Hyundai Steel relies on a nonbinding trial court opinion in a separate case, addressing the same program *Hyundai Steel v. United States*, 658 F. Supp. 3d 1331 (Ct. Int'l Trade Sept. 26, 2023).  Pursuant to that decision, and under protest, Commerce subtracted from the benefit calculation "the amount reported by Hyundai as the cost of construction for

the North Incheon Harbor applicable to the [period of review]." *See Hyundai Steel Co. v. United States*, CIT court no. 21-00304, ECF No. 57 at 4.

Hyundai Steel argues that this Court should also conclude, as the trial court did in that case, that Commerce was required to consider Hyundai Steel's costs in constructing the port facilities to determine whether the company received a benefit.  Hyundai Steel Br. at 15 (citing *Hyundai Steel*, 658 F. Supp. 3d at 1336).  However, the trial court in that case, unlike the trial court here, did not address or consider *AK Steel*, which is controlling precedent on this discrete issue of construction costs offsetting countervailing determinations.  The case, therefore, is of little persuasive value.  Moreover, we respectfully disagree with the decision in that case.  Commerce's remand redetermination in that proceeding, which was done under protest, was consistent with the case before this Court, in that Commerce maintained that construction costs should not be considered in the benefit determination.  *See Hyundai Steel Co. v. United States*, CIT Court No. 21-00304, ECF No. 57 at 2.

Contrary to Hyundai Steel's argument, it did receive an "advantage" where Hyundai Steel entered into an agreement with the government of Korea under which Hyundai Steel would construct a port, and the government of Korea provided various benefits to Hyundai Steel as a result.  Appx16783; *see also* Appx16504-16505 (explaining that the government of Korea "helped Hyundai

22

Steel build a port for its own use for an extended period of time…[and] provided the benefit for this program through reimbursements as well as forgoing revenue that the [government of Korea] was otherwise entitled to collect…").

Commerce determined that Hyundai Steel was given the right to operate the port for such an extended period of time that it amounted to constructive ownership, and it is the only party that has used the port.  Appx16783.  The fact that ownership of the port legally reverts to the Korean government after a long period of time is not a meaningful difference from the examples contained in the *CVD Preamble.*  Those examples confirm that a government action causing the imposition of a cost should be considered separate from a subsidy benefit that offsets that cost.  *Id.*; *see also CVD Preamble*, 63 Fed. Reg. at 65,361.  Therefore, Commerce's determination that it need not consider how Hyundai Steel's behavior or costs are altered when it received a financial contribution that lowers its costs or increases its revenues is in accordance with law and is supported by substantial evidence.

Hyundai Steel also draws comparisons to the findings by the CIT in *Government of Sri Lanka v. United States*, 308 F. Supp. 3d 1373, 1383 (Ct. Int'l Trade 2018) (*GOSL*).  *See* Hyundai Steel Br. at 19-20.  Hyundai Steel focuses on the holding in *GOSL* that repayments "'satisfy neither the statutory definition, nor the regulatory interpretation of what constitutes a benefit'" to support the

conclusion that the port usage rights it received under the port program do not provide a countervailable benefit. *See* Hyundai Steel Br. at 19 (citing *GOSL*, 308 F. Supp. 3d at 1384). Hyundai Steel posits that, under the agreement, "the [government of Korea] assumed ownership of the harbor facilities constructed, and Hyundai Steel 'served as a payment vehicle for the construction of public infrastructure,' *i.e.*, the port facility." *Id.* at 20 (citation omitted). Thus, Hyundai Steel argues that when "viewed in this context, it is plain that unlike a grant, loan, or equity infusion, the provision of port usage rights to Hyundai Steel 'satisfies neither the statutory definition, nor regulatory interpretation of what constitutes a benefit.'" *Id.* (citing *GOSL*, 308 F. Supp. 3d at 1384).

Hyundai Steel's emphasis on contextualizing any benefit within a governmental action's overall burden stretches the holding of *GOSL* too far. It also overlooks the fact that Commerce routinely countervails benefits that reduce otherwise greater liabilities. *See, e.g.*, *Hyundai Steel Co. v. United States,* 659 F. Supp. 3d 1327, 1340 (Ct. Int'l Trade 2023). Hyundai Steel's comparisons of this program to a grant, loan, or equity infusion are inapplicable because Commerce found the port program was a financial contribution in the form of revenue forgone

pursuant to 19 U.S.C. §1677(5)(ii), and not a direct transfer of funds under 19 U.S.C. § 1677(5)(i).

As Commerce explained, the Guaranteed Price Scheme for Rubber (GPS) program under consideration in *GOSL* is not comparable to the port of Incheon program. Appx16504. The GPS program was implemented to support small-scale rubber farmers, by facilitating payments to these farmers via buyers of natural rubber such as the respondents in *GOSL*. *Id.* However, in the present case, the port program was not implemented for the purpose of supporting other beneficiaries; indeed, Hyundai Steel concedes "no third parties used the port." *Id.*; *see also* Hyundai Steel Br. at 4-5.

Furthermore, *GOSL* characterized the transactions at issue as resulting in a detriment, rather than a benefit, to the respondents. Appx16505; *see also GOSL*, 308 F. Supp. 3d at 1382. Respondents in *GOSL* were required to buy natural rubber at a guaranteed price for the benefit of the small farmers, and in turn the government reimbursed respondents for the difference between the guaranteed price and the average rubber price. Appx16505.

Such a feature does not exist in the current port program; the government of Korea did not require Hyundai Steel to build a port at a certain cost, nor did the government of Korea require Hyundai Steel to build a port to benefit other recipients. *Id.* To the contrary, the port program is not detrimental to Hyundai

Steel but is plainly to its benefit. Hyundai Steel actively entered into the agreement, is able to use the port for an extended period of time, received initial reimbursements from the government of Korea between 2004 and 2007, and was given the right to collect fees from third parties that the government of Korea otherwise would have collected. Appx16503-16505; *see also* Appx15589.

Consistent with Court's holding in *AK Steel*, Commerce reasonably determined that *GOSL* is not applicable to the facts of this case. Because these cases are distinguishable or not binding on the issue on appeal, this Court should instead follow its decision in *AK Steel* and sustain the trial court's final judgment.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the final judgment of the Court of International Trade.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:
HENDRICKS VALENZUELA
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
    Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
(202) 329-3648
Hendricks.Valenzuela@trade.gov


April 5, 2024

/s/Christopher A. Berridge
CHRISTOPHER A. BERRIDGE
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
(202) 353-0537
Christopher.Berridge@usdoj.gov


Attorneys for Defendant-Appellee